J-A05019-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAHLEEL C. DAVIS | : | |
| | : | |
| Appellant | : | No. 1964 EDA 2019 |

Appeal from the Judgment of Sentence Entered January 18, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0006720-2017

BEFORE: OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.: **FILED OCTOBER 06, 2021**

Appellant Jahleel C. Davis appeals from the judgment of sentence entered following his jury trial conviction for attempted murder and related offenses. Appellant claims that the Commonwealth failed to provide requested discovery and violated ***Brady v. Maryland***, 373 U.S. 83 (1963). After review, we affirm in part, vacate in part as to the sentence for conspiracy to commit murder, and deny Appellant's application for remand.

We affirm. Additionally, we deny Appellant's application for remand for an evidentiary hearing.

We adopt the facts and procedural history set forth in the trial court's opinion. ***See*** Trial Ct. Op., 12/27/19, at 1-17. Briefly, on the night of August 8, 2017, Appellant and Jamal Jones (co-defendant) shot Kendall Rosendary in

_____

[*] Former Justice specially assigned to the Superior Court.

Norristown, Pennsylvania.[1]  At that time, Rosendary was walking on Cherry Street near a playground.  Rosendary heard people yelling, and ran when he saw someone with a gun.  Appellant and his co-defendant shot Rosendary multiple times.  Rosendary was rushed to a hospital and survived.  Rosendary could not identify who shot him, but told police that at least three men, all of them armed, had attacked him.  Rosendary also recalled that two of the attackers were wearing dark hooded sweatshirts.

Norristown Police chased a Chevrolet Impala that left the vicinity of the shooting at high speed.  The Impala pulled onto Cherry Street and three individuals fled the Impala on foot.  The police recovered a .38 Special caliber revolver containing six fired cartridge casings from the Impala's interior.

The police searched the area around where the Impala stopped and arrested Appellant in the early morning hours of August 9, 2017.  The police recovered a .45 caliber Para-Ordnance handgun and a black hooded sweatshirt near the area where they arrested Appellant.  The police also recovered a cell phone from Appellant.  The police arrested co-defendant and another male (the third individual) nearby hiding under a back porch.  The police recovered a .40 caliber Glock Model 27 handgun from the area where they arrested co-defendant and the third individual.

---

[1] The shooting of Rosendary was related to a series of shootings involving rival groups of young men from Norristown and Pottstown.  Appellant and co-defendant intended to kill a member of the Norristown faction in retaliation for the murder of Jordan Scott, a member of their Pottstown faction. Rosendary was not affiliated with either group.

The police recovered both fired cartridge casings of various calibers and bullet fragments from the scene of the shooting. Detective Eric Nelson of the Montgomery County Detective Bureau, an expert in the field of forensic firearms identification and analysis, testified that he examined the aforementioned firearms as well as fired cartridge casings, bullets, and bullet fragments that the police recovered from the scene of the Rosendary shooting. Detective Nelson opined that the Glock 27 firearm recovered near co-defendant fired the .40 caliber fired cartridge casings he examined. Detective Nelson also concluded that a single firearm had fired the recovered .45 caliber cartridge casings, but the Para-Ordnance pistol the police recovered when they arrested Appellant did not fire those .45 caliber cartridge casings. Detective Nelson further testified that some of the bullets and bullet fragments that were recovered from the scene of the shooting were consistent with bullets fired from the Glock 27 pistol and others were consistent with bullets fired from the .38 Special caliber revolver. The police also recovered several 9mm caliber fired cartridge casings from the scene of the shooting, but the police never recovered a 9mm caliber firearm after the shooting.

The Pennsylvania State Police Harrisburg Regional Crime Lab found gunshot residue on the sweatshirt recovered near Appellant. Albert Lattanzi of the Harrisburg Crime Lab testified that the presence of this residue on the sweatshirt was consistent with the recent firing of a gun by the wearer of the shirt or that the shirt's wearer was near someone else firing a gun.

The police performed swabs on the firearms they recovered from Appellant, his co-defendant, and the Impala to test for DNA. The parties stipulated, in relevant part that the DNA swabs taken from the grip of the .38 Special caliber revolver found in the back of the Impala contained a mixture of DNA from at least three individuals, and it was 19,660 times more likely that Appellant was one of those three individuals than a random person.

Appellant's cell phone contained videos and photographs depicting various firearms. Appellant made numerous posts on Facebook expressing his desire to get revenge for the death of Scott, that he intended to "grab bigger guns," "mask up," and "catch another body."

Appellant testified that he, co-defendant, and the third individual attended a party in Norristown on August 8, 2017. Appellant stated that after the three of them left the party and were walking down the street, someone called to them. Appellant saw a man pointing a gun at him. Appellant could not identify Rosendary as that gunman. Appellant testified that he and his companions ran away from the gunman, who opened fire. Appellant stated that he then drew his gun and returned fire, and that he and his companions got into co-defendant's Impala and fled from the shooter. Appellant and the others then abandoned the car and fled on foot after police vehicles blocked their path. Appellant claimed his comments on social media were references to the music he listens to.

On November 2, 2018, the jury convicted Appellant of attempted murder, conspiracy to commit murder, aggravated assault, conspiracy to commit aggravated assault, and possession of an instrument of a crime.[2]

During the sentencing hearing, Lieutenant Todd Dillon of the Norristown Police Department testified that during his investigation, he concluded that Tyrique Lyons was the intended target of Appellant and his co-defendant. N.T. Sentencing Hr'g, 1/18/19, at 22. Lieutenant Dillon explained that Lyons, Haj Washington, and Elijah Jones had a confrontation with individuals from Pottstown about forty-five minutes prior to the Rosendary shooting and they went to the Cherry Street Park to "lay[] low". *Id.* at 22, 27, 30. Dillon testified that after Lyons, Washington, and Jones saw a passing vehicle that the three men recognized as one from Pottstown, they left the park. *Id.* at 22, 28-29, 31-32. He further stated that when Lyons and his companions returned, they saw the victim on a stoop across from the park. *Id.* at 22. Lieutenant Dillon stated his conclusion that Rosendary was in the wrong place at the wrong time. *Id.* at 22-23. Dillon explained that he knew who the intended targets were because "they," meaning Lyons, Washington, and Jones, had spoken to the police about two or three weeks after the shooting. *Id.* at 26-27, 32.

Ultimately, on January 18, 2019, the trial court sentenced Appellant to concurrent terms of twenty to forty years' imprisonment for attempted murder and conspiracy to commit murder. The trial court also sentenced Appellant to

---

[2] 18 Pa.C.S. §§ 901(a), 903(a)(1), 2702(a)(1), 903(a)(1), and 907(a), respectively.

a consecutive term of one to two years' imprisonment for possession of an instrument of crime. Appellant's aggregate sentence is twenty-one to forty-two years' imprisonment. Appellant filed a timely post-sentence motion for a new trial, alleging, among other things, that the Commonwealth violated Pa.R.Crim.P. 573 and *Brady*. Specifically, Appellant alleged that he had requested copies of all witness statements related to the shooting and that the Commonwealth had not turned over the witness statements of Lyons, Washington, and Jones that Lieutenant Dillon described during the sentencing hearing. Post-Sentence Mot., 1/25/19, at ¶¶ 27-37. Appellant asserted that if this information had been disclosed to him, he could have presented evidence at trial about "plausible alternative suspects who may have possessed the two missing firearms that were not recovered from the scene of the shooting." *Id.* at ¶ 38. Appellant also argued that this evidence would have corroborated Appellant's trial testimony that he acted in self-defense because a group of Norristown individuals approached him and opened fire, and Appellant returned fire. *Id.* at ¶¶ 39-41, 43, 46.

The trial court held post-sentence motion hearings on May 10, and June 3, 2019. Lieutenant Dillon testified at the May 10, 2019 hearing that, of the three individuals who the police believed were intended targets of the shooting, only Lyons spoke to the police and his prior testimony about speaking with "them" (*i.e.* all three individuals) was erroneous. N.T. Post-Sentence Hr'g, 5/10/19, at 12-13. Lieutenant Dillon explained that Detectives Leeds and Sowell conducted the interview with Lyons, and he was present for

most of that interview. *Id.* at 20-21. The interview occurred about two weeks after the Rosendary shooting. *Id.* at 17. Lieutenant Dillon testified that the Norristown Police Department does not have policies regarding witness interviews. *Id.* at 21. He stated that it is up to the individual officer to record a witness interview, and that Lyons would only speak to the police off the record, would not give a formal statement, and would not testify. *Id.* at 22-23. Lieutenant Dillon recalled that Lyons said that he and his companions had a confrontation with members of the Pottstown faction about forty-five minutes to an hour before Kendall Rosendary was shot. *Id.* at 13. Lyons, Jones, and Washington fled the confrontation and hid in Cherry Street Park. *Id.* at 13, 15-16. While in the park, Lyons saw a car that he thought belonged to members of the Pottstown faction pass by and Lyons believed that the Pottstown group was hunting him and his companions. *Id.* at 13, 31. Lyons and his companions left the park, and about six minutes after leaving the park, Lyons heard gunshots. *Id.* at 13, 22, 34. Lieutenant Dillon explained that information about Lyons, Washington, and Jones being the intended targets of the August 8, 2017 shooting was included in a timeline of gun violence turned over to Appellant during discovery. *Id.* at 25, 35.

Detective Stephen Sowell testified that he and Detective Charles Leeds spoke with Lyons. N.T. Post-Sentence Hr'g, 6/3/19, at 35-36, 54. Lieutenant Dillon came in and out during the interview. *Id.* at 41, 54. Lyons told the detective that he was at Cherry Street Park and did not witness the actual shooting. *Id.* at 36-37. Detective Sowell could not recall if Lyons stated that

he heard the shooting. *Id.* at 54-55. Lyons told the detectives that he saw a car circling the block several times, which made Lyons worried and he left the park. *Id.* at 37-38, 53. Also that night, there was an anonymous 911 call about a confrontation between two groups of black males in the area. *Id.* at 39. Detective Sowell did not create a report memorializing this interview because Lyons did not give a statement, and he would not sign anything. *Id.* at 40-41, 52. Detective Sowell did not take any notes during the interview. *Id.* at 51.

Detective Charles Leeds testified that he and Detective Sowell spoke with Lyons on August 22, 2017. *Id.* at 56, 62. During the interview, Lieutenant Dillon came in and out of the interview room. *Id.* at 58. Detective Leeds asked Lyons if he was willing to have his interview written down, and Lyons said that he was not. *Id.* at 62. Detective Leeds recalled that Lyons said he was hanging out in the park, saw a car circling the area, and then left the park. *Id.* at 57-58. According to Detective Leeds, Lyons "very clearly told us he left [the park] prior to the shooting." *Id.* at 64. Detective Leeds did not take any notes during the interview with Lyons, but he summarized the information he received from Lyons in an email to Lieutenant Dillon. *Id.* at 57, 63-64.

The trial court denied Appellant's post-sentence motion on June 10, 2019. Appellant then timely appealed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On February 10, 2020, Appellant filed an application for remand to the trial court for an evidentiary hearing regarding after-discovered evidence. This Court denied Appellant's application without prejudice to raise the issue in his brief or in a subsequent application. Order, 2/28/20. Appellant filed a new application for remand on February 22, 2021, again requesting that we remand for the trial court to consider Appellant's after-discovered evidence claim. The Commonwealth filed a response on February 24, 2021. This Court deferred resolution of Appellant's application for remand to the present panel. Order, 2/26/21.

Appellant raises two issues for our review:

1. Were the Appellant's rights under Pa.R.Crim.P. 573 violated where the Commonwealth failed to inform the Appellant, in a case involving a claim of self-defense by unknown assailants, about the eyewitness status, or the address, of an eyewitness that had interviewed with police about the crime, gave details about his involvement in an altercation immediately preceding the crime, admitted to being in the vicinity of the shooting, and stated that he believed that the Appellant was out to get him?

2. Were the Appellant's rights under the due process protections afforded by Article 1, Sections 1, 9, and 11 of Pennsylvania's Constitution, and the Due Process Clauses of the 5th and 14th Amendments of the United States Constitution, violated where the Commonwealth failed to disclose to the Appellant, in a case involving a claim of self-defense by unknown assailants, a police interview with a witness that admitted to having [an] altercation with the Appellant approximately thirty minutes prior to the shooting, who believed that Appellant wanted to kill him, and who admitted to being in the vicinity of the shooting when gunshots were fired?

Appellant's Brief at 4 (formatting altered).

## Rule 573 Discovery Violation

In his first issue, Appellant argues that the Commonwealth violated Pa.R.Crim.P. 573(B)(2)(a) by withholding the existence of Tyrique Lyons as a witness.[3]  *Id.* at 10-20.  Specifically, Appellant contends that Lyons told the police that he had been in the vicinity of the shooting with two of his associates, he had confronted Appellant prior to the shooting, and that he believed that Appellant was in the area to kill him.  *Id.* at 11.  Appellant notes that a July 24, 2018 email to the assistant district attorney proves that the Commonwealth was aware of Lyons' interview with the police.  *Id.* at 12. Appellant contends that Lyons was an eyewitness for the purposes of Rule 573(B)(2)(a) and his identity was discoverable under that Rule.  *Id.* at 13-15. Appellant argues that, unlike **Brady**, Rule 573 does not require Appellant to act diligently in seeking the withheld evidence.  *Id.* at 15-16.   Finally, Appellant concludes that the Commonwealth's failure to disclose Lyons' identity as a witness was not harmless error because Lyons' testimony would have corroborated Appellant's claim that he shot Rosendary in self-defense.

_____

[3] Appellant also asserts that the Commonwealth did not disclose in discovery information about an interview the police had with Rosendary shortly after the shooting.  Appellant's Brief at 10.  Appellant claims this interview contained impeachment material.  *Id.*  However, Appellant did not include this claim in his statement of questions.  **See** Pa.R.A.P. 2116(a) (stating that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby").  Further, Appellant has failed to develop his claim about the Rosendary interview with any citations to the record or applicable law.  Therefore, it is waived.  **See Commonwealth v. Rodgers**, 605 A.2d 1228, 1239 (Pa. Super. 1992) (stating that "[w]e must deem an issue abandoned where it has been identified on appeal but not properly developed in the appellant's brief" (citation omitted)).

- 10 -

*Id.* at 19-20.

The Commonwealth responds that Appellant is not entitled to relief under the discretionary discovery provisions of Rule 573. Commonwealth's Brief at 21-25. Specifically, the Commonwealth asserts that, during discovery, it provided a timeline documenting gun violence in Norristown, which listed Lyons as one of the possible intended targets of the August 8, 2017 shooting. *Id.* at 23-24. The Commonwealth also claims that Lyons was named in a statement from the mother of one of his friends. *Id.* at 24. Further, the Commonwealth contends that Lyons is not an "eyewitness" because the confrontation between Lyons and Appellant occurred forty-five minutes prior to the shooting. *Id.* at 25.

The Commonwealth also argues the Appellant is not entitled to relief under the mandatory disclosure provisions of Rule 573. *Id.* at 25-32. The Commonwealth asserts that it turned over in discovery several items identifying Lyons, Washington, and Jones as the intended targets of the shooting. *Id.* at 28-30.

We note that "decisions involving discovery in criminal cases lie within the discretion of the trial court. The court's ruling will not be reversed absent abuse of that discretion."[4] *Commonwealth v. Smith*, 955 A.2d 391, 394 (Pa. Super. 2008) (*en banc*) (citations omitted).

_____

[4] We have recently emphasized that this Court "does not directly review the conduct of prosecutors. Instead, under *Brady*, its progeny, and the Rules of
*(Footnote Continued Next Page)*

- 11 -

Additionally, this Court has explained:

> While the trial court retains the discretion to fashion an appropriate remedy when a party has violated the discovery rules, such discretion is not unfettered. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Santos*, 176 A.3d 877, 882 (Pa. Super. 2017) (citations and quotation marks omitted).

Rule of Criminal Procedure 573 provides, in relevant part:

**(B) Disclosure by the Commonwealth.**

> (1) *Mandatory*. In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
>
> > (a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;
> >
> > (b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or

---

Criminal Procedure, we review **the trial court's appraisal** of prosecutorial acts or omissions, and whether those actions warrant a new trial." *Commonwealth v. Felder*, 247 A.3d 14, 20 (Pa. Super. 2021) (emphasis in original). Appellant's arguments are directed towards the Commonwealth's conduct and he does not discuss whether the trial court abused its discretion in denying his post-sentence motion for a new trial. *See* Appellant's Brief at 10-20. Nevertheless, because Appellant's failure to discuss the relevant standard of review does not impede our review, we decline to find waiver.

inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth;

\* \* \*

(f) any tangible objects, including documents, photographs, fingerprints, or other tangible evidence; and

\* \* \*

(2) *Discretionary With the Court*.

(a) In all court cases, except as otherwise provided in Rules 230 (Disclosure of Testimony Before Investigating Grand Jury) and 556.10 (Secrecy; Disclosure), if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the following requested items, upon a showing that they are material to the preparation of the defense, and that the request is reasonable:

(i) the names and addresses of eyewitnesses;

(ii) all written or recorded statements, and substantially verbatim oral statements, of eyewitnesses the Commonwealth intends to call at trial;

(iii) all written and recorded statements, and substantially verbatim oral statements, made by co-defendants, and by co-conspirators or accomplices, whether such individuals have been charged or not; and

(iv) any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interests of justice.

\* \* \*

**(D) Continuing Duty to Disclose.** If, prior to or during trial, either party discovers additional evidence or material previously requested or ordered to be disclosed by it, which is subject to discovery or inspection under this rule, or the identity of an additional witness or witnesses, such party shall promptly notify the opposing party or the court of the additional evidence, material, or witness.

**(E) Remedy.** If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 573(B), (D), (E).

Further, this Court has explained:

A defendant seeking relief from a discovery violation must demonstrate prejudice. A violation of discovery does not automatically entitle appellant to a new trial. Rather, an appellant must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure.

*Commonwealth v. Causey*, 833 A.2d 165, 171 (Pa. Super. 2003) (citations and quotation marks omitted).

Turning to the instant case, the trial court explained:

Contrary to [Appellant's] claims, the evidentiary hearings established [that] the following information was provided to [Appellant] months prior to trial:

a) Kendal[l] Rosendary was considered as a mistaken identity victim and the possible intended targets were Tyrique Lyons, Elijah Jones, Terrell Castile, and Haj Washington. Norristown v. Pottstown Gun Violence Timeline, Exhibit C-176.

b) Elijah Jones' mother, Sparkle Jones, provided a statement to police where she:

a. noticed an Impala circling the block,

b. received a phone call from her son's girlfriend that some boys were driving around looking for her son and Haj Washington,

- 14 -

c. stated that her son was in the house when she received that call and believed he had just been out with Tyrique Lyons and Terrell Castile, and

d. heard gunshots about six minutes after receiving that phone call. Email regarding Sparkle Jones, Exhibit C-177.

c) Christina Powel-Williams provided a statement to police where she observed:

a. the green Impala circling Cherry Street five to six times,

b. groups of teenage boys walking the streets of Norristown where one group appeared "upset" and "angry," and

c. one person from another group with hoodies stating, "I am not going far down. I'm am trying to shoot from here." Powell-Williams Statement, Exhibit C-198.

It is clear that the only "new" evidence not provided to [Appellant] was Lieutenant Dillon's statement that Lyons, Jones, and Washington had a confrontation with [Appellant] forty-five minutes before the shooting and were hiding in the park before, not at the time, of the shooting. [Appellant] claims a Rule 573 violation even though Lieutenant Dillon did not memorialize the conversation with Lyons.

* * *

[Appellant] claims he was prejudiced by the late information because it "would have allowed . . . [Appellant] to create a plausible scenario of self-defense that [he] otherwise lacked." [Appellant] had ample opportunity to develop the theory of his case as he was aware of the other intended victims prior to trial. [Appellant] clearly knew from the Norristown versus Pottstown timeline that Lyons, Washington, and Jones were "possible intended targets" of the shooting. The additional details provided by Lieutenant Dillion [*sic*] could have been discovered by defense counsel's own due diligence. "Where the evidence is equally accessible or inaccessible to both the Commonwealth and the defense, the defense cannot use the discovery rules against the Commonwealth for its failure to produce the evidence." ***See***

- 15 -

[***Santos***, 176 A.3d at 883] (citing ***Commonwealth v. Dent***, 837 A.2d 571, 585 (Pa. Super. 2003)). In spite of [Appellant's] claims, the record is clear that [Appellant] was provided with documentation months before trial that Lyons, Washington, and Jones were [Appellant's] intended targets, that a confrontation occurred between young men from Pottstown and Norristown before the shooting, and that Jones' mother saw an Impala circling the block before the shooting. The only "new" information not previously disclosed was that Lyons, Washington, and Jones were in the park near the shooting before Rosendary was shot.

[Appellant's] claim that Lieutenant Dillon had a duty to memorialize the Lyons oral statement lacks merit. In ***Commonwealth v. Small***, 741 A.2d 666 (Pa. 1999), police officers failed to record oral conversations with witnesses that occurred before the witnesses were interviewed on tape in a murder and rape investigation. ***Small***, 741 A.2d at [676]. The appellant in ***Small*** argued that the Commonwealth was required to produce evidence of these oral conversations to the defense. ***Id.*** The Court held that the police had no duty to reduce to writing an interview with a potential witness. ***See id.*** at 676-77 . . . .

[Appellant's] discovery violation claim lacks merit and does not warrant a new trial.

Trial Ct. Op. at 23-25 (some record citations omitted)

We agree with the trial court's conclusion that the police were not required to document Lyons' statement, particularly because he only agreed to speak to the detectives "off the record." ***See Small***, 741 A.2d at 676-77. Additionally, as noted by the trial court, the Commonwealth disclosed material to Appellant prior to trial indicating that the police considered Lyons, Washington, and Jones as the intended targets of the shooting. ***See*** Trial Ct. Op. at 23-24; ***see also*** N.T. Post-Sentence Hr'g, 5/10/19, at 25, 35. Appellant presented a justification defense at trial, *i.e.*, that although he was

involved in the August 8, 2017 shooting that wounded Rosendary, Appellant was defending himself from individuals from Norristown who shot at him first.

We also agree with the trial court that, even if the Commonwealth violated Rule 573 by failing to disclose additional information regarding Lyons' off-the-record interview with detectives, Appellant was aware that the police believed that Lyons, Washington, and Jones were the intended targets of the August 8, 2017 shooting based on other material the Commonwealth had already disclosed. *See* Trial Ct. Op. at 25. Appellant had the opportunity to investigate these individuals further and to call them as witnesses at trial. Based on the evidence presented at trial and at the post-sentence hearing, we conclude that Appellant has failed to demonstrate that he was prejudiced by the Commonwealth's failure to disclose the Lyons interview. *See Causey*, 833 A.2d at 171. Therefore, we discern no abuse of discretion by the trial court in denying Appellant's request for a new trial based on a violation of Rule 573, under either subsection (B)(1) or (B)(2). *See Santos*, 176 A.3d at 882.

### *Brady* **Violation**

In his second issue, Appellant claims that the Commonwealth violated *Brady* by withholding Lyons' identity as a witness. Appellant's Brief at 20-23. Appellant argues that *Brady* extends to the evidence in the files of police agencies. *Id.* at 20-21 (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). Appellant contends that he is entitled to a new trial because there is a reasonable probability that if information about Lyons' interview with police

had been disclosed to him, the outcome of his trial would have been different. *Id.* at 22.

The Commonwealth responds that Appellant has failed to prove the prongs of a *Brady* violation. Commonwealth's Brief at 36-45. Specifically, the Commonwealth contends that Appellant did not explain how the verbal exchange between Appellant's group and Lyons' group forty-five minutes before the shooting of Rosendary was material to Appellant's justification defense. *Id.* at 41. The Commonwealth argues that Appellant cannot satisfy the third prong of *Brady* by asserting that there was a mere possibility that the undisclosed information might have helped his defense. *Id.* at 41-42. The Commonwealth also contends that even if Appellant had known about Lyons' interview with the police, this would not have affected the outcome of the trial because of the abundance of evidence against Appellant. *Id.* at 42-44.

Initially, we note that a claim that the trial court erred in denying Appellant's request for a new trial based on a *Brady* violation "presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Bagnall*, 235 A.3d 1075, 1084 (Pa. 2020) (citation omitted).

We have explained:

To succeed on a *Brady* claim, a defendant must show that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued. The defendant carries the burden to

prove, by reference to the record, that evidence was withheld or suppressed by the prosecution. Additionally, the evidence at issue must have been material evidence that deprived the defendant of a fair trial. Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

\* \* \*

**Brady** does not require the disclosure of information that is not exculpatory but might merely form the groundwork for possible arguments or defenses, nor does **Brady** require the prosecution to disclose every fruitless lead considered during a criminal investigation. The duty to disclose is limited to information in the possession of the government bringing the prosecution, and the duty does extend to exculpatory evidence in the files of police agencies of the government bringing the prosecution. **Brady** is not violated when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources.

**Commonwealth v. Sandusky**, 203 A.3d 1033, 1061-62 (Pa. Super. 2019) (citations omitted and formatting altered).

"[A] reasonable probability of a different result is established when the government's suppression of evidence undermines confidence in the outcome of the trial." **Commonwealth v. Chamberlain**, 30 A.3d 381, 409-10 (Pa. 2011) (citations omitted and formatting altered). "In engaging in this analysis, a reviewing court is not to review the undisclosed evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record." **Id.** at 410 (citation omitted).

Following our review of the record, the parties' briefs, and the well-reasoned conclusions of the trial court, we affirm on the basis of the trial

court's opinion with respect to Appellant's **_Brady_** claim. **_See_** Trial Ct. Op. at 26-28. Specifically, we find that the trial court properly concluded that Appellant failed to act with reasonable diligence to investigate Lyons and the other individuals police identified as the intended targets, to determine if they had useful information about the night of the shooting. **_See id._** at 26; **_see also Sandusky_**, 203 A.3d at 1061-62. Additionally, we agree with the trial court that in light of the evidence presented at trial, Appellant failed to establish prejudice. **_See_** Trial Ct. Op. at 27-28; **_see also Chamberlain_**, 30 A.3d at 409-10; **_Sandusky_**, 203 A.3d at 1061-62.

**Appellant's Application for Remand**

Finally, we address Appellant's application to remand the matter for an evidentiary hearing based on after-discovered evidence. **_See_** App. for Remand, 2/22/21. Therein, Appellant claims that his counsel obtained a copy of the Norristown Police Department's written policy regarding witness interviews in connection with another matter. **_Id._** at ¶ 12. Appellant asserts that this policy contradicts Lieutenant Dillon's testimony at the post-sentence motion hearing. **_Id._** at ¶¶ 13-16. Appellant intends to call Lieutenant Dillon and Assistant District Attorney Kristen Kemp as witnesses at the evidentiary hearing. **_Id._** at ¶ 17. Appellant states that he will use this document to prove that the Norristown detectives who investigated the instant shooting failed to follow their department's internal policies, which caused their failure to investigate rival gang members as possible suspects for the shooting. **_Id._** at ¶¶ 18-20. Appellant also intends to use the policy to establish that Lieutenant

Dillon committed perjury, but denies that the evidence is being offered for impeachment purposes. *Id.* at ¶¶ 21, 24-25. Appellant asserts that this evidence would likely produce a different result at trial. *Id.* at ¶ 22.

The Commonwealth responds that Appellant cannot satisfy the four prongs of the standard for granting a new trial based on after-discovered evidence because the evidence Appellant is relying on is being offered mainly for impeachment purposes. Ans. to App. for Remand, 2/23/21, at 4-6 (citing *Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008)). The Commonwealth further argues that the policy does not show that the officers failed to follow procedure because the policy states that officers are to document interviews "whenever possible." *Id.* at 6 (record citation omitted). The Commonwealth contends that it was not possible for the officers to document their interview with Lyons because Lyons only agreed to speak to the officers "off the record." *Id.* at 7. Lastly, the Commonwealth asserts that this evidence is not of such a nature and character that a different outcome is likely because of the overwhelming evidence of guilt presented at trial. *Id.* at 7-8.

Pennsylvania Rule of Criminal Procedure 720(C) provides that "[a] post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Pa.R.Crim.P. 720(C). The comment to Rule 720 states that a claim of "after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the

trial judge." Pa.R.Crim.P. 720 cmt; *see also Commonwealth v. Rivera*, 939 A.2d 355, 358-59 (Pa. Super. 2007) (remanding for an evidentiary hearing based on claim of after-discovered evidence first raised on appeal).

When a defendant raises a claim of after-discovered evidence for the first time on direct appeal and requests a remand to the trial court for an evidentiary hearing, this Court must determine whether the defendant has met the pleading requirements for an evidentiary hearing under Rule 720(C). *See Commonwealth v. Heaster*, 171 A.3d 268, 274 (Pa. Super. 2017). Specifically, we must determine if the defendant has articulated how the evidence he intends to present at a hearing would satisfy the after-discovered evidence test. *Id.* at 275; *see also Commonwealth v. Castro*, 93 A.3d 818, 828 (Pa. 2014) (explaining that a defendant must "clearly articulate in his motion what evidence he would present to meet the [after-discovered evidence] test").

> [A]s our Supreme Court has explained, to warrant an evidentiary hearing on a claim of after-discovered evidence, the request must, at the very least, "**describe the evidence that will be presented at the hearing. Simply relying on conclusory accusations . . . is insufficient to warrant a hearing.**" [*Castro*, 93 A.3d at 827]. "[T]he hearing is for the presentation of evidence, not the potential discovery of evidence. An evidentiary hearing . . . is not meant to function as a fishing expedition for any possible evidence that may support some speculative claim[.]" [*Id.* at 827-28].

*Heaster*, 171 A.3d at 273-74 (formatting altered and emphasis added).

To establish an after-discovered evidence claim, a petitioner must prove by a preponderance of the evidence, the following:

> (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely. At an evidentiary hearing, an appellant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.

*Rivera*, 939 A.2d at 359 (citation omitted).

Turning to the instant application for remand, Appellant does not identity when he first came into possession of the witness interview policy, he also does not explain why he could not have obtained the policy before the conclusion of the trial by reasonable diligence. Appellant merely states that his counsel obtained the policy as part of another matter. *See* Pa.R.Crim.P. 720(C) (providing that a claim of "after-discovered evidence discovered during the direct appeal process must be raised promptly"); *see also Rivera*, 939 A.2d at 359 (the first prong of the after-discovered evidence test is that the "the evidence could not have been obtained before the conclusion of the trial by reasonable diligence").

Assuming, *arguendo*, that Appellant acted promptly and with reasonable diligence in obtaining the policy and raising his claim with this Court, he has not met the other pleading requirements for an evidentiary hearing under Rule 720. Appellant asserts that he is not offering the policy for impeachment purposes, yet he argues that Lieutenant Dillon perjured himself by denying that such a policy existed. *See Rivera*, 939 A.2d at 359 (reiterating that after-discovered evidence may not be used solely for purposes of

impeachment). Further, Appellant asserts that at the hearing, he will show that the detectives failed to follow their department's witness interview policy by not documenting their interview with Lyons. Appellant argues that this lack of documentation resulted in the police failing to investigate whether rival gang members were present at the Rosendary shooting. Appellant claims that the deficient police investigation deprived him of evidence that would have supported his claim of self-defense. However, Appellant has not identified any evidence, other than the witness interview policy, that he intends to present at the hearing to prove that the investigation was defective. *See Castro*, 93 A.3d at 828 (a defendant must "articulate in his motion what evidence he would present" at an evidentiary hearing). We conclude that Appellant's application relies on conclusory allegations, which do not establish the proper basis for granting an evidentiary hearing. *See id.*, at 827. Essentially, Appellant requests an evidentiary hearing in order to develop his claims that the police could have uncovered additional evidence placing rival gang members at the scene of the Rosendary shooting. *See Heaster*, 171 A.3d at 275 (stating that a motion raising a claim of after-discovered evidence "is not to serve as a preemptive means of securing a hearing that will itself comprise the investigation"); *see also Castro*, 93 A.3d at 828 (explaining that an "evidentiary hearing is not meant to function as a fishing expedition").

Based on our review of Appellant's application for remand, we conclude that Appellant has not satisfied the pleading requirements for an evidentiary

hearing under Rule 720, and we discern no basis to remand this matter to the trial court for an evidentiary hearing.  **See Heaster**, 171 A.3d at 274-75.

## Legality of Sentence

We also address the legality of Appellant's sentence, which this Court may raise *sua sponte*.  **See Commonwealth v. Pi Delta Psi, Inc.**, 211 A.3d 875, 889 (Pa. Super. 2019).  Pursuant to 18 Pa.C.S. § 906, "[a] person may not be convicted of more than one inchoate crime of attempt, solicitation, or conspiracy for conduct designed to commit or to culminate in the commission of the same crime."  A Section 906 violation goes to the legality of the sentence.  **See Commonwealth v. Jacobs**, 39 A.3d 977, 982 (Pa. 2012) (plurality); **see also Commonwealth v. Cooke**, 492 A.2d 63, 70 n.3 (Pa. Super. 1985) (addressing Section 906 violation *sua sponte*).

> The issue of whether a sentence is illegal is a question of law; therefore, our task is to determine whether the trial court erred as a matter of law and, in doing so, our scope of review is plenary. Additionally, the trial court's application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law.

**Commonwealth v. Williams**, 871 A.2d 254, 262 (Pa. Super. 2005) (citations and quotation marks omitted).

The courts of this Commonwealth have interpreted the term "convicted" as used in Section 906 "to mean the entry of a judgment of sentence, rather than a finding of guilt by the jury." **Jacobs**, 39 A.3d at 983 (citing, *inter alia*, **Commonwealth v. Grekis**, 601 A.2d 1284, 1295 (Pa. Super. 1992)).

In **Commonwealth v. King**, 234 A.3d 549 (Pa. 2020), the defendant argued that Section 906 prohibited the trial court from imposing sentences for both attempted murder and conspiracy to commit murder where the object of those offenses was a single victim. **King**, 234 A.3d at 566-67. Our Supreme Court found "that [defendant] entered into one agreement with his co-conspirator to murder [the victim] and, because he failed in his attempt to do so, [defendant] could not be sentenced to serve separate terms for the inchoate crimes of conspiracy and attempt." **Id.** at 568. Our Supreme Court explained that "[b]y enacting Section 906, the General Assembly declared that where a defendant tries to achieve a result – in this case, murder – but fails to do so, he may only be punished once in the absence of distinct criminal objectives." **Id.** at 572. The **King** Court vacated the defendant's consecutive sentences for attempted murder and conspiracy to commit murder. **Id.**; **see also Cooke**, 492 A.2d at 70 (vacating concurrent sentence for conspiracy to commit robbery where defendant had also been sentenced for attempted robbery where the two offenses were designed to commit the same crime).

Here, the trial court imposed concurrent sentences of twenty to forty years' imprisonment for attempted murder and conspiracy to commit murder. However, both crimes had the same object: to kill Kendall Rosendary. Therefore, Appellant's sentence for conspiracy to commit murder is illegal because it violates 18 Pa.C.S. § 906, and it must be vacated. **See King**, 234 A.3d at 572; **Cooke**, 492 A.2d at 70.

Because the trial court imposed concurrent sentences, our disposition does not upset the trial court's overall sentencing scheme, therefore we need not remand. *See Commonwealth v. Lomax*, 8 A.3d 1264, 1268-69 (Pa. Super. 2010); *Commonwealth v. Thur*, 906 A.2d 552, 569-70 (Pa. Super. 2006).

For these reasons, we conclude that the trial court did not err in denying Appellant's request for a new trial. Further, Appellant is not entitled to a remand for an evidentiary hearing to determine if a new trial is required based upon after-discovered evidence. In sum, we affirm Appellant's convictions, but vacate the sentence for conspiracy to commit murder, and we affirm the judgment of sentence in all other respects.

Judgment of sentence affirmed in part and vacated in part as to sentence for conspiracy to commit murder only. Appellant's application for remand denied.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 10/6/2021*

COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :    CP-46-CR-0006720-2017

    :

v.    :

    :

JAHLEEL C. DAVIS    :    1964 EDA 2019

    :

## OPINION

HAAZ, J.              December 27, 2019

### INTRODUCTION

Defendant, Jahleel Davis, has appealed the court's order dated June 10, 2019 which denied his post-sentence motion.

This case arose from the shooting of Kendall Rosendary on August 8, 2017 in Norristown, Pennsylvania. Defendant Jahleel Davis and co-defendant Jamal Jones were arrested shortly after the shooting. Criminal complaints were filed against Davis and Jones charging them with attempted murder and related crimes on August 10, 2017.

On January 17, 2018, the Davis prosecution was consolidated with *Commonwealth v. Jamal Jones,* Docket No. CP-46-CR-0006906-2017. On December 21, 2017, Defendant filed an omnibus pre-trial motion that included a motion to suppress evidence pertaining to the prosecution against him only. On September 28, 2018, Defendant filed a supplemental omnibus pre-trial motion. Evidentiary hearings were held on Defendant's motions on October 3, 2018 and October 16, 2018. The motion was denied by memorandum and order dated October 26, 2018.

A jury trial commenced on October 26, 2018. On November 2, 2018, Defendant was convicted by a jury of attempted murder, conspiracy to commit attempted murder, aggravated assault, conspiracy to commit aggravated assault and possession of an instrument of a crime. On

1

January 18, 2019, Defendant was sentenced to twenty (20) to forty (40) years imprisonment for the attempted murder conviction, a concurrent sentence of twenty (20) to forty (40) years for the conspiracy to commit murder conviction, and a consecutive sentence of one (1) to two (2) years for the possession of an instrument of crime conviction. Defendant's conviction for aggravated assault merged with his attempted murder conviction and his conviction for conspiracy to commit aggravated assault merged with his conspiracy to commit murder conviction. Defendant appeals from his judgment of sentence.

On January 25, 2019, Defendant filed a post-sentence motion for an evidentiary hearing and new trial. On February 28, 2019, Defendant filed a supplemental post-sentence motion for the production of witnesses. A post-trial conference was held on March 21, 2019. An order denying the motion for the production of witnesses was filed on March 25, 2019. The court held evidentiary hearings on the post-sentence motion on May 10, 2019 and June 3, 2019. The court denied Defendant's post-sentence motion on June 10, 2019.

On July 9, 2019, Defendant filed a notice of appeal to the Superior Court. On July 10, 2019, the court ordered Defendant to file a concise statement of errors complained of on appeal within twenty-one (21) days pursuant to Pa.R.A.P. 1925(b). On July 31, 2019, Defendant filed the following concise statement of errors complained of on appeal, summarized below:

1. Defendant alleges the court erred by denying his post-sentence motion for an evidentiary hearing and new trial, alleging *Brady* and discovery violations, and by denying his post-sentence motion to produce witnesses. *See* Concise Statement of Errors Nos. 1-3.
2. Defendant alleges the court erred in overruling Defendant's objections to the scope of the expert testimony of Edward Schikel and Dirk Boughter. *See* Concise Statement of Errors Nos. 4, 9.

3. Defendant alleges the court erred in overruling Defendant's objection to witness Andrew Licwinko's testimony for violation of Pa.R.Crim.P. 573. *See* Concise Statement of Errors No. 5.

4. Defendant alleges the court erred in denying Defendant's request for a mistrial following prejudicial statements made by witness David Mazza. *See* Concise Statement of Errors No. 6.

5. Defendant alleges the court erred in denying Defendant's request for the entirety of a prior recorded statement to be introduced at the time of Commonwealth's questioning of Defendant pursuant to Pa.R.E. 106. *See* Concise Statement of Errors No. 7.

6. Defendant alleges the court erred in overruling Defendant's objection to the authenticity of Facebook records introduced by witness Felicia Mickie. *See* Concise Statement of Errors No. 8.

7. Defendant alleges the court erred in denying Defendant's request for a mistrial following testimony by witness Dirk Boughter that he did not preserve notes and diagrams he created of the crime scene. *See* Concise Statement of Errors No. 10.

8. Defendant alleges the court erred in denying Defendant's pretrial motions for the suppression of phone material and Defendant's statements made to police after his arrest. *See* Concise Statement of Errors Nos. 11, 13.

9. Defendant alleges the court erred in denying Defendant's motion for a *Frye* hearing pursuant to Pa.R.E. 702. *See* Concise Statement of Errors No. 12.

10. Defendant alleges the court erred in granting the Commonwealth's pretrial motion for the introduction of evidence of prior bad acts in violation of Pa.R.E. 403 and 404. *See* Concise Statement of Errors No. 14.

## EVIDENCE AT TRIAL

The shooting which occurred in this case was part of the aftermath of shootings which occurred between rival groups of young men in Pottstown and Norristown. Lieutenant Kenneth Lawless of the Norristown Police Department was involved in the investigation of shootings that occurred in Norristown in the summer of 2017 when Jordan Scott was murdered and TayeWynder was shot and injured. T2 139-140. Lt. Lawless testified that there were a series of shootings in Norristown and Pottstown that were believed to be part of an ongoing Norristown

3

versus Pottstown feud. T5 1083-1085. Kendall Rosendary, the victim in this case, was an innocent bystander in what was intended to be the shooting of a member of the rival Norristown group in retaliation for the murder of Jordan Scott, a member of the Pottstown group.

Detective William Mitchell, Jr. was a detective with the Montgomery County District Attorney's Office at the time of the subject events. T4 765. Detective Mitchell was involved in the investigation surrounding the murder of Jordan Scott, also known as "Bud," which occurred on July 6, 2017. *Ibid.* At that time, Jordan Scott was residing with Taye Wynder in Pottstown. T4 765-766. William Wilson and Isaiah Freeman were from Norristown. T4 766-767. Both were convicted of the murder of Jordan Scott. T4 766. Freeman was convicted of first-degree murder and Wilson was convicted of third-degree murder. T4 769.

Corporal Brian Graham was a police officer with the Norristown Police Department at the time of the subject events. T3 435. On August 8, 2017, at approximately 11:00 p.m., Corporal Graham was patrolling in Norristown in the 500 and 600 block of Cherry Street when he received a report of a possible disturbance by a caller who identified herself as Chris Williams. *Ibid.* Based on Ms. Williams' information, Corporal Graham sent out a dispatch about individuals from Pottstown possibly being in Norristown to retaliate. T3 436.

Lt. Lawless and other officers were dispatched to the area of the 500, 600 and 700 blocks of Cherry Street in Norristown, Montgomery County shortly after 11:00 p.m. on August 8, 2017. T2 157-158. At approximately 11:33 p.m., while on the 600 block of Cherry Street, Lt. Lawless heard what he thought were fireworks. T2 158-159. After exiting his car at 719 Cherry Street, a bullet went through the trees just above his head and he realized he was hearing gunshots. *Ibid.* He returned to his vehicle and saw a silver Chevy Impala "further up on the next block leaving the scene at a high rate of speed." T2 159.

4

Lt. Lawless notified other officers that the fleeing vehicle was travelling north on Cherry Street as he kept sight of the vehicle. T2 161. Officer Jason Hoover turned his vehicle from Elm Street onto Cherry Street to block the path of the fleeing vehicle. *Ibid.* Lt. Lawless drove toward the Impala. T2 161-162. He approached the blocked vehicle and saw three occupants of the Impala abandon the vehicle and flee on foot. T2 162-163. The occupants appeared to be African-American and were wearing dark hoodies, one of which had an Adidas emblem. T2 164. The occupants hopped a fence and ran through the backyards of nearby houses. T2 162. Police then set up a perimeter to prevent the suspects from escaping the area. T2 164-165.

Officer Hoover was in his vehicle on Swede Street near its intersection with Oak Street when he heard gun shots. T3 319-321. Officer Hoover drove up Swede Street where it intersected with Elm Street and turned left. T3 322. Lt. Lawless informed Officer Hoover by radio that a silver Chevy sedan was pulling out of the area and travelling at a high rate of speed north on Cherry Street. *Ibid.* Officer Hoover turned down Cherry Street to block the sliver Chevy from leaving the area. *Ibid.* He observed three individuals get out of the Chevy and run from the vehicle. T3 323. Two of the fleeing individuals were wearing dark-colored clothing, one with a black hooded sweatshirt with a white Adidas logo on it. T3 324. The third individual was wearing lighter-colored clothing with a grayish top. *Ibid.*

Lt. Lawless and other officers established a perimeter and continued pursuit of the suspects while Officer Hoover remained behind and secured the abandoned vehicle. T3 334. The front passenger door of the abandoned vehicle was still open and the passenger's side of the car had bullet holes in it. *Ibid.* Located in the back seat of the vehicle in plain view was a black revolver. *Ibid.* The revolver was a .38 Special caliber that contained fired cartridge casings in its cylinder. T4 784. Officer Hoover located a magazine for a .40 caliber Glock pistol in the lower

5

pocket of the front passenger door. T3 334-335. Officer Hoover recovered a small black cell phone on the outside of the driver's side door. T3 336.

Officer Jeffrey Portock was with the Pottstown Police Department and the Montgomery County SWAT West team at the time of the subject events. T3 424. Officer Portock was attached to the K9 Unit and had a canine partner with specialized training to search and track the suspects. T3 424-425. Officer Portock was on patrol in Pottstown when he received a dispatch to Norristown for a canine assist. T3 425. Officer Portock and his canine partner tracked the fleeing individuals using the scents from the abandoned Chevy Impala. T3 427-433. With the assistance of his canine partner, Officer Portock located Defendant Jones and Taron Ebo-Wilson[1] hiding underneath the back porch of a house at 837 Swede Street in Norristown in the early morning hours of August 9, 2017. T2 170-71; T3 427-433; 425.

Defendant Jones was discovered together with Taron Ebo-Wilson underneath the back porch of the house located at 837 Swede Street. T2 169; 170-171. Ebo-Wilson was wearing a gray sweatshirt. T3 389. Lt. Lawless performed a pat down search of Defendant Jones and found the key to the abandoned Impala. T2 171-172. Defendant Jones told Lt. Lawless it was the key to his Impala. T2 171. This key was matched to the Chevy Impala that had been abandoned on Cherry Street. T2 171-172. A firearm was also recovered in the immediate area where Defendant Jones and Taron Ebo-Wilson were hiding. T2 181. The firearm was a .40 caliber Glock Model 27. T3 359.

---

[1] Taron Ebo-Wilson was the third person in the Impala vehicle with Davis and Defendant and fled with Defendant. He pled guilty to attempted murder and conspiracy to commit murder on October 12, 2018 arising from the Rosendary shooting. *Commonwealth v. Ebo-Wilson*, Docket No. CP-46-CR-0006721-2017. He was sentenced to undergo imprisonment for not less than 8 years nor more than 20 years in state prison pursuant to the negotiated plea agreement.

6

Corporal Brian Graham located Defendant Davis in the backyard of 844 Cherry Street in the early morning hours of August 9, 2017. T2 173; T3 435-36; T3 440. Lt. Lawless testified that Davis was found next to a black hooded sweatshirt with an Adidas emblem on it. T2 173; Ex. C-145a. A camouflage-printed mask was also recovered in the immediate area of Defendant Davis. T2 179-180; T3 442-443. During the investigation the following day detectives discovered a .45 caliber handgun in a bucket near where Defendant Davis was found. T3 581-582. The gun had eight live rounds of ammunition in it. T4 658-659.

Officer Joshua Keenan of the Norristown Police Department was at the intersection of Marshall and Cherry Streets in Norristown when he heard gunshots. T3 384. He received information that an individual had been shot on Cherry Street and proceeded to that location to render aid. T3 385. Upon encountering the victim of the shooting, Kendall Rosendary, Officer Keenan observed that he had "multiple pentrating traumatic injuries to both his upper and lower extremities" and he was "bleeding profusely." T3 385-387. Officer Keenan stated he had never seen someone lose so much blood and survive. T3 387-388. No firearm or ammunition was recovered from Rosendary. T3 437.

Lt. Lawless stayed at the site of the shooting on the 800 block of Cherry Street after Mr. Rosendary was transported to a hospital for treatment. T2 166. He observed blood stains on the sidewalk and multiple shell casings in the street. *Ibid.* There also appeared to be several strike marks on the sidewalk where the sidewalk had been struck by bullets. T2 176-177. Several bullets were later extracted from strike marks in nearby fences. T2 215. Corporal Graham estimated that fired cartridge casings were located approximately five (5) to ten (10) feet from where Rosendary had collapsed on the sidewalk from his injuries. T3 439.

Kendall Rosendary was twenty-six (26) years old at the time of the shooting. T2 219. He testified that he was shot fifteen times on August 8, 2017.[2] T2 219-220. Rosendary was shot while walking on Cherry Street near the location of a playground and park at the intersection of Cherry and Oak Streets. T2 220. Rosendary heard people yelling at him and he tried to look back. T2 221. He saw a gun, tried to run and then realized he had been shot. T2 257. Rosendary could not identify who shot him. T2 221. He continued to get shot after he fell to the ground. T2 222. Rosendary stated that he was not armed and did not fire a gun at any point. T2 224.

Rosendary was transported to Penn Presbyterian Hospital where he underwent numerous surgeries before he was discharged the next month to a rehabilitation facility. T2 224-225; T5 1005. He then spent several more months at the rehabilitation facility. T2 225-226. Rosendary was still having regular appointments for medical treatment approximately once every other month at the time of trial and will likely require additional surgeries. T2 247. Rosendary stated that he suffered from guns-shot wounds in almost every major area of his body. T2 226. As a result of the injuries he suffered on August 8, 2017, he can longer run or perform regular exercise, and must use a colostomy bag. T2 227.

Rosendary was intubated while he was a patient at Penn Presbyterian Hospital. T2 228. On August 14, 2017, after the intubation tube was removed from Rosendary's throat, he gave a statement to Detectives David Mazza and Greg Henry while still in the hospital. T2 228-229. Detective Greg Henry provided a summary of Rosendary's statement that Rosendary heard one of the males call him a "bitch." T2 228-233. According to their summary, he told detectives he saw three unknown males approach him and start shooting. T2 231-232. At trial, he recalled

---

[2] The parties stipulated that the victim was treated at Penn Presbyterian Hospital from August 9, 2017 to September 13, 2017 where he was treated for 13 gunshot wounds, seven of which were entry wounds. It was further stipulated that the victim had multiple surgeries over the course of his commitment at the hospital and suffered serious bodily injury. T5 1005.

8

thinking that it was actually more than three individuals. T2 232-233. He told detectives the individuals shot him several more times as he was lying on the ground. T2 233. He stated the individuals were black males, in their mid to late teens, and that they were all armed with handguns. T2 234. The detectives' summary stated that Rosendary told them that two of the shooters were wearing dark hooded sweatshirts, though Rosendary could not recall telling that to detectives. *Ibid.*

On September 7, 2017, Rosendary gave a second statement to Detective Mazza and Detective Steven Sowell. T2 235-237. Rosendary told detectives that on August 8, 2017, on the 800 block of Cherry Street, three men got out of a light-colored car and all three had guns and shot him. T2 239-240. He said he was shot in his shoulder, stomach, arm, both thighs, hip, knee, butt and foot. T2 241.

Rosendary told detectives that the shooters were young black males. T2 241-242. He described the car that they were in as "light, like tan." T2 242. He said that he did not know why they shot him and that he did not know them. *Ibid.* While in the hospital, Rosendary provided police with a DNA sample. T2 246.

Detective Dirk Boughter was with the Montgomery County Detective Bureau in the Major Crimes Unit at the time of the subject events. T3 510-511. The parties stipulated that Detective Boughter qualified as an "expert in crime scene analysis." T3 511. Detective Boughter was called to analyze the crime scene during the early morning hours of August 9, 2017. T3 513.

Detective Boughter testified that nine 9 millimeter fired cartridge casings, nine .40 caliber fired cartridge casings and five .45 caliber fired cartridge casings were recovered from the crime scene. T3 530. Five bullet fragments were also recovered from the crime scene. T3 531. The

9

.40 caliber cartridge casings matched the Glock 27 located near Defendant Jones and Ebo-Wilson when they were apprehended. T4 665. However, detectives later learned that the .45 caliber handgun recovered near Defendant Davis in the backyard of 844 Cherry Street was not the firearm that had fired the .45 caliber fired cartridge casings discovered at the scene of the shooting. T3 582.

During his investigation, Detective Boughter discovered two strike marks on a white Mazda SUV parked on the west side of Cherry Street just north of where the victim was shot. T3 538-540. There was also a bullet fragment between the Mazda's front wheel and the curb "as if it had exited out of the hood and down." *Ibid.* There were strike marks and a recovered bullet fragment on the fence post of the playground behind the area where the victim was found. T3 545; 548. No strike marks, indicative of return fire, were discovered on the opposite side of the street. T3 569-570. There were also three strike marks observed on the passenger side of the Chevy Impala. T3 571.

As part of his investigation, Detective Boughter collected twenty-three (23) fired cartridge casings from the scene as well as multiple bullet fragments. T3 514-515. He testified that the pattern of fired cartridge casings was consistent with how semi-automatic weapons expel cartridge casings to the side of the weapon. T3 524-525; 529. Detective Boughter testified that the pattern of the fired cartridge casings was consistent with the shooter having been in motion while firing, specifically towards the direction of the victim and his direction of travel as evidenced by the blood trail on the sidewalk. T3 565-569; T3 436-437. The fired cartridge casings were inconsistent with having been fired or emptied from a revolver. T3 525.

10

Detective Boughter performed DNA swabs on the recovered firearms. T4 650-651. DNA swabs were also performed on the .38 caliber revolver recovered from the Chevy Impala. T5 986. The parties stipulated that the DNA swabs taken from the trigger of the .40 caliber Glock 27 found near Defendant Jones and Ebo-Wilson contained a mixture from at least two individuals and that it was greater than one million (1,000,000) times more likely that Taron Ebo-Wilson was one of those individuals. T5 983-987; Ex. C-162; C-164. Further, the DNA swabs taken from the grip of the .38 Special caliber revolver found in the back of Jones' Chevy Impala contained a mixture from at least three individuals and was nineteen thousand six hundred sixty (19,660) times more likely that Defendant Davis was one of those individuals. *Ibid.*

Detective Eric Nelson was a detective with the Montgomery County Detective Bureau at the time of the subject events. T4 771. Detective Nelson was qualified to offer expert opinions in the field of forensic firearms identification and analysis. T4 774. Detective Nelson testified that some of the bullets and bullet fragments recovered at the crime scene had microscopic characteristics that were consistent with having been fired from a .40 caliber Glock 27 like the one recovered near Ebo-Wilson and Defendant Jones. T4 795-797. Other bullets and bullet fragments that were recovered were consistent with having been fired from a .38 Special caliber revolver like the one recovered in the back of the Chevy Impala. T4 800-801.

Detective Edward Schikel of the Montgomery County Detective Bureau was qualified to offer expert opinions in the field of forensic crime scene analysis. T4 687. Detective Schikel testified that the pattern of fired cartridge casings and strike marks observed at the crime scene was consistent with shots being fired from the street in the direction of the sidewalk where the victim was found. T4 699-700. He also observed strike marks on the passenger's side of the Chevy Impala. T4 703-704.

11

Detective Schikel executed a search warrant for the Chevy Impala. T4 702; Ex. C-139. Detective Schikel found identifications of Taron Ebo-Wilson and an individual named Clay Jones within the vehicle. T4 707-708. Detective Schikel discovered several live .45 caliber rounds as well as a .40 caliber magazine for a Glock pistol inside the vehicle. T4 715-716; 718. A halloween mask was also recovered from inside the vehicle. T4 706.

Albert Lattanzi worked on this case as a forensic scientist with the Pennsylvania State Police in the Harrisburg Regional Crime Lab. T3 401-402. He was qualified as an expert in the field of forensic testing for gunshot and gunpowder residue. T3 404. Mr. Lattanzi performed gunshot residue and gunpowder testing on samples collected from the black Adidas sweatshirt found near Defendant Davis at the time of Davis' apprehension. T3 403; T3 410-411; T3 442. Mr. Lattanzi testified to the presence of gunshot residue on the black Adidas sweatshirt, consistent with firing a gun. T3 413-416.

Officer Andrew Licwinko was a police officer with the Pottstown Police Department at the time of the subject events. T5 912-913. Officer Licwinko testified that he had previously observed Defendant Davis and Defendant Jones in the Pottstown area. T5 923; 928. In particular, he had seen them associating with Ahbayah Davila and other individuals who referred to themselves as members of a group known as ATM. T5 923; 928. He testified that this group changed its name to BGB, which stood for "Bud Gang Bitches," after the murder of Jordan Scott. T5 923-924; 1046. Officer Licwinko personally observed some of the individuals with whom Defendant Davis associated posting their membership in the group on social media. *Ibid.* Others had "BGB" tattooed on their bodies. *Ibid.* He saw Defendant Jones at the preliminary hearing of Ahbayah Davila on an unrelated matter. T5 925.

12

Detective Gregory Henry was a detective with the Montgomery County Detective Bureau at the time of the subject events. T5 1006. Detective Henry reviewed the cell phone extractions from the phones recovered outside the driver's side door of the Chevy Impala as well as in the center console of the Chevy Impala. T5 1013-14. He also reviewed the Facebook accounts of Jamal Jones and Leel Stacks.[3] T5 1014. On Defendant Davis' Facebook account under the name "Leel Stacks," there were several images that identified him as being a member of BGB. T5 1043. The cell phone found outside the Chevy Impala contained photos and videos of Defendant Jones, indicating the cell phone belonged to him. T5 1014. In addition, a phone number associated with that cell phone was the same phone number that Defendant Jones provided police upon his arrest. T5 1014-1015.

Detective Henry reviewed the extraction from a third cell phone, an LG phone, that was physically removed from Defendant Davis upon his arrest. T5 1015. The number associated with this phone was nearly the same as the one Defendant Davis provided with some of the numbers transposed in a slightly different order. T5 1016. This phone appeared to be linked to the Leel Stacks Facebook account. *Ibid.* There were several calls between Defendant Jones' and Defendant Davis' phones, the last call being on the date of the shooting around 9:00 p.m. T5 1017.

The cell phones contained numerous videos and images that depicted Jones and Davis in possession of firearms. T5 1020-1030; 1033-1038. Some of these included images of firearms that matched the caliber of fired cartridge casings recovered at the scene of the Rosendary shooting. 1067-1073. Some of these images were dated shortly before the shooting and at least one appeared to have been taken the same day. T5 1025-1026; 1032-1033. In one video

---

[3] Defendant Davis was saved in Defendant Jones' contacts as "Leel," and Defendant Jones was saved in Defendant Davis' phone as "Mal." T5 1017-1018.

extracted from Defendant Davis' phone, Defendant Davis identifies himself as being part of BGB and repeatedly says "gang gang" while another individual is waving a gun at the camera. T5 1029-1030. Images from Defendant Davis' phone, time stamped August 7, 2017, the day before the shooting, showed multiple firearms on a person's lap. T5 1024-1026. One of the images from Defendant Davis' phone, time stamped on the date of the shooting, showed a revolver that resembled the revolver that was recovered from the backseat of Defendant Jones' Impala. T5 1033; 1079. With respect to Defendant Jones' phone, there were a series of photographs showing firearms on an individual's lap, one of them including an extended magazine. T5 1033-35. Other images showed Defendant Jones with Ebo-Wilson. T5 1035. One video retrieved from Defendant Jones' phone appears to be taken in Defendant Jones' Impala, showing Ebo-Wilson and Defendant Jones, who referenced the word "gang." T5 1036-1037.

There were a number of Facebook posts mourning the death of Jordan Scott. T5 1044-1045. One of Defendant Davis' posts, created on July 7, 2017, the day after Jordan Scott was murdered, expressed a desire to get revenge for Scott's death. *Ibid.* A post on Jordan Scott's Facebook page from Defendant Davis states "Death is never a option or planned but revenge is." *Ibid.* Two days later, Defendant Davis posted "RS, Bud gone, so the love is gone ...its war now." T5 1048. On July 18, 2017, Defendant Davis posted "Losing Bud turned me to a monster. The thought of losing another made me grind harder." T5 1047. On August 7, 2017, the day before Rosendary was shot, Defendant Davis and one "BGB Tone" message each other through Facebook. T5 1145-1147. BGB Tone writes to Defendant Davis saying "Niggas who kill Bud, his people" and Defendant Davis responds "Yeah, nigga wanna beef, grab bigger guns." T5 1146-47.

14

Felicia Mickie was a Montgomery County Juvenile Probation Officer who was supervising Defendant Davis in the summer of 2016. T3 492. During her supervision of Defendant Davis, she learned that he associated with a group known as "ATM." T3 492-493. She also had personal knowledge of other individuals who identified themselves as members of ATM, which stood for "Addicted to Money." T3 493; 508. Defendant Davis and the other members of this group were all from Pottstown. T3 494. Officer Mickie stated ATM changed its name to BGB after the murder of Jordan Scott. *Ibid.* Officer Mickie had no knowledge of Defendant Jones and whether he was a member of this group. T3 508-509.

Pursuant to her supervision, she obtained possession of Defendant Davis' cell phone. T3 493. Defendant Davis' messages were to and from individuals identified as members or associates of ATM. T3 503. Defendant Davis' Facebook messages with Nathaniel Howard, also known as Coke Boy Montana, stated "Get the drop. We can both slide. You know how I rock. Mask up. Let's do it right." T3 503-505. Howard's response stated "When they mask up, they coming for you[r] ice. When they bare face, they coming for your life." T3 505-506. Defendant Davis responded, in part, by stating he had been "itching to catch another body." T3 506.

Defendant Davis testified at trial. T5 1088-1165. He testified that he was in Norristown on August 8, 2017 to meet a girl named Bree. T5 1089. After searching for Bree unsuccessfully, Defendant Davis ran into Jamal Jones and Taron Ebo-Wilson. T5 1090. They attended a nearby party and engaged in a confrontation after Davis said he was from Pottstown. T5 1091. All three decided to leave the party. *Ibid.* Jamal Jones' car was their means of transportation out of Norristown. *Ibid.*

15

After walking down the street for a few minutes, they noticed a group of people congregating and coming down the street toward them. T5 1091-1092. They continued to walk down the street, feeling nervous and scared, considering their prior confrontation at the party. T5 1092. Defendant Davis testified as follows: "And when we walked, somebody said, 'Yo.' And when we turned around, in the motion of us turning around, we seen somebody raising their gun." *Ibid.* He was unable to identify the person with the gun as Rosendary. T5 1120. Defendant Davis started running. T5 1092; 1099-1100. After taking two or three steps, he heard a gunshot. T5 1099-1100. After a pause, Defendant Davis removed a gun tucked underneath his jacket near his hip and began shooting in the direction he heard gunfire. T5 1092; 1100.

Defendant Davis proceeded to run and shoot back at the same time. T5 1092. Defendant Davis felt a bullet whiz past him while he ducked his head and continued shooting. *Ibid.* Defendant Davis, Jones, and Ebo-Wilson reached Defendant Jones' car and Jones drove them away from the shooting scene. T5 1092-1093. Police vehicles cut them off and they all abandoned Jones' car and fled on foot. T5 1093. Defendant was caught hiding in the backyard of a property in Norristown several hours later. T2 173. *Ibid.*

Defendant initially told police he had nothing to do with the shootings, even though he admitted at trial he shot a firearm multiple times. T5 1127-1128. Defendant Davis explained that he ran because he was just involved in a shooting, had a gun on him, and was afraid of being arrested. Defendant Davis said that he did not recognize Rosendary in the courtroom, and did not know who he was when firing towards him. T5 1103-04. He had seen Rosendary in jail a few times, but never knew who he was. T5 1104.

Defendant Davis explained the Norristown versus Pottstown feud. T5 1104-1107. The feud involved two individuals, one of them being Jordan Scott, fighting over a female whom

16

Defendant Davis did not personally know. T5 1105-1106. He testified Jordan Scott was not his only good friend who died that summer. T5 1104-1105. He testified that he was the only one with a connection to Jordan Scott and Jones did not know Jordan Scott to his knowledge. T5 1107. Defendant Davis further testified he believed that neither Jones nor Taron Ebo-Wilson had a history involving illegal firearms, unlike himself. T5 1109-1110. He testified his inflammatory remarks with respect to his conversation with BGB Tone and his statements about "masking up" referenced music he listens to. T5 1108-1109.

## LEGAL ANALYSIS

### 1. Post Sentence Motion for Evidentiary Hearing and New Trial

Defendant claims the court erred by denying the Defendant's post sentence motion for an evidentiary hearing and a new trial. Defendant's motion included the following grounds for granting a new trial: a discovery violation pursuant to Pa.R.Crim.P. 573, violation of defendant's due process rights to exculpatory evidence, and the discovery of post-trial evidence.

Defendant's sentencing hearing was conducted on January 18, 2019. The Commonwealth called Lieutenant Todd Dillon from the Norristown Police Department as a witness. N.T. Sentencing 15. Lieutenant Dillon testified about the violent conflict between individuals from Pottstown and Norristown and how it affected public safety concerns in Norristown. N.T. Sentencing 16-22. Lt. Dillon testified that Tyrique Lyons told police that Haj Washington, Elijah Jones and Tyrique Lyons were the intended targets of the shooting on August 8, 2017. N.T. Sentencing 22. On cross examination, Lieutenant Dillon testified that the intended victims and Defendant had a confrontation approximately forty-five minutes prior to the Rosendary shooting where "[t]here was some back and forth between . . . Norristown people and Pottstown people . . ." N.T. Sentencing 27. After the confrontation, the three men went to the Cherry Street

17

Park to hide. N.T. Sentencing 30. Lieutenant Dillon testified about the confrontation between the three men and Defendant as follows:

> Q: Can you tell me exactly what happened?
>
> A: They had a confrontation prior on the 500 block of Cherry Street with people from Pottstown. There were words exchanged and then they went and hid out in the park, Cherry Street Park, saw the car come by that they associated with the Pottstown people hunting them. They fled the park. Then within a few minutes of them fleeing the park Mr. Rosendary was shot.
> N.T. Sentencing 30.
>
> . . .
>
> Q: So it's fair to say that the only reason why you knew that this this was a shooting of a mistaken innocent person is because the alleged intended victims said that they knew that there was a car from Pottstown that came through and that when they came back someone was laying on the floor shot, correct?
>
> A: I didn't say they came back. I think you're a little – no. I know Mr. Rosendary. I've known him my entire career, all right. What we gathered afterwards – as we work the case, that's one thing. What we gathered afterwards – because we didn't get to speak to those defendants or those people – they were what they thought were the intended targets until maybe two or three weeks after this case. So, like, you know after Kendall was shot.
>
> You know, they didn't witness anything. They just had an idea that they were – you know, that they were targeted. So the time frame was correct. So I know Kendall Rosendary wouldn't be involved in anything like that. I've known him and his family for thirty-one years.
> N.T. Sentencing 31-32.

Defendant claimed Lieutenant Dillon's testimony included "new" information (the fact that the three intended targets had a confrontation with Defendant approximately forty-five minutes prior to the shooting, were present at the park before the shooting, saw a Pottstown vehicle go by, and fled the park) which had not been provided to Defendant in discovery. N.T. Sentencing 27; *See* Def.'s Post Sentence Motion for Evidentiary Hearing and New Trial at 6-8.

18

The Defendant subsequently filed a post-sentence motion for an evidentiary hearing and new trial on January 25, 2019.

Based upon Defendant's claim that the Commonwealth failed to disclose Lyons' unrecorded and unmemorialized statement to the police, the court issued an order dated February 14, 2019 directing the Commonwealth to produce the following:

    a) Any and all reports or summaries of statements by Tyrique Lyons, Haj Washington, and Elijah Jones to Lieutenant Dillon and all other law enforcement personnel;

    b) Documentation identifying when all said reports, statements and/or summaries were provided to Defense counsel; and

    c) If no said reports, statements and/or statements were made arising from law enforcement's interaction with Tyrique Lyons, Haj Washington and Elijah Jones, the legal basis and criteria for why said statements, reports and/or summaries were not created.

Order, 2/14/19.

The Commonwealth filed a response and supplement to the court's order on March 18, 2019 and March 21, 2019, respectively. A post-trial conference on the matter was held on March 21, 2019. The court also scheduled evidentiary hearings on May 10, 2019 and June 3, 2019 based upon Defendant's claims that the Commonwealth committed discovery and/or *Brady* violations and its claim that after-discovered evidence entitled Defendant to a new trial.

The post-sentence conferences and evidentiary hearings established the following. Lyons spoke to the police approximately two weeks after the Rosendary shooting. N.T. Post-Trial Conference, 3/21/19 at 4-5; N.T. Post-Sentence Mot. Hearing, 5/10/19 at 27. Jones and Washington never spoke to the police. N.T. Post-Trial Conference, 3/21/19 at 4. Detective Charles Leeds and Detective Stephen Sewell conducted an off the record conversation with Lyons and Lieutenant Dillon was partially present.[4] N.T. Post-Sentence Mot. Hearing, 5/10/19 at

---

[4] Detective Sowell testified that during the conversation with Lyons and Detective Leeds, Lieutenant Dillon came in and out of the room. N.T. Post-Sentence Motion Hearing, 6/3/19 at 50.

19

20-22. During their conversation, Lyons confirmed he left the park[5] prior to the shooting and had not seen the shooting take place. *Id.* at 22; N.T. Post-Sentence Mot. Hearing, 6/3/19 at 64. Lyons told the police that he was on the block and turned the corner just as the shooting occurred. N.T. Post-Sentence Mot. Hearing, 6/3/19 at 16. Lieutenant Dillon testified that "he [Lyons] basically just kind of confirmed he hadn't seen anyone, he couldn't name anyone. He just believed, in relevance to when they fled the park and then a short time later there were gunshots, he just assumed they were after him again." N.T. Post-Sentence Mot. Hearing, 5/10/19 at 22. Detective Leeds testified that "He [Lyons] very clearly told us he left prior to the shooting." N.T. Post-Sentence Mot. Hearing, 6/3/19 at 64. Their conversation was not memorialized in writing as Lyons only agreed to speak with the police off the record. N.T. Post-Sentence Mot. Hearing, 5/10/19 at 22. Lyons also told the police that he would not testify in court. *Ibid.* Lieutenant Dillon stated that there are no policies regarding whether witness interviews need to be memorialized in writing. *Id.* at 21-22.

### a. Discovery Violation

Defendant alleges the Commonwealth failed to provide required discovery to defense counsel pursuant to Pa.R.Crim.P. 573. The evidentiary hearings established that Detective Sowell and Detective Leeds of the Norristown Police Department had an off-the-record conversation with Lyons on August 22, 2017 where Lyons stated that he thought he was the intended target of the shooting. N.T. Post-Sentence Motion Hearing, 6/3/19 at 5-6. Lyons told the detectives that he was in the back of the park, saw a car circling the area, and left out of the back of the park before the shooting started. *Id.* at 67.

The post-trial conference and evidentiary hearings established that the following documents regarding Lyons, Jones, and Washington were provided to Defendant before trial.

---

[5] The Rosendary shooting occurred on a sidewalk that abuts Cherry Park.

Defendant received a document titled "Norristown vs. Pottstown Gun Violence Timeline," marked as Commonwealth's trial exhibit 176. N.T. Post-Trial Conference, 3/21/19 at 8-9. Number ten of the timeline states the following:

**8/8/2017 Tues 2333 hrs**
Inc #: 17-3256
Inc Type: Shooting
Location: 800 Blk Cherry
- Kendall Rosendary (Vic)
- Jahleel Davis (Arr)
- Jamal Jones (Arr)
- Taron Wilson (Arr)
. . .
- Possible mistaken identity, possible intended targets Tyrique Lyons, Elijah Jones, Terrell Castile, Haj Washington

Exhibit C-176.

Defense counsel stipulated at trial to receiving exhibit 176 before trial, stating: "Your Honor, I will stipulate for the record that I received that [Commonwealth Exhibit 176] back sometime in July, sometime in the early part of the summer." T4 638. In addition, the Commonwealth provided Defendant with an email from Detective Sowell to Lieutenant Dillon regarding a conversation with a witness named Sparkle Jones. N.T. Post-Trial Conference, 3/21/19 at 8-9. The relevant portion of the email, marked as the Commonwealth's trial exhibit 177,[6] provides as follows:

> I just got off the phone with SPARKLE JONES, mother of ELIJAH JONES. She said that on Wednesday of last week, she was sitting in a car on the corner of Oak and Green Street when she noticed a Impala that kept circling the block. SPARKLE said that at the Impala caught her attention, and at the time she believed that it may be a family of the girl she had just fought the prior day. She then went home and got a phone call from FATIMAH BOYD, girlfriend of ELIJAH. FATIMAH wanted to know where ELIJAH was because she got a phone call saying that some boys were

---

[6] Defendant acknowledged receipt in discovery of this email on January 2, 2018. N.T. Post-Trial Conference, 3/21/19 at 6. Exhibit C-177 was marked as a trial exhibit, but was never admitted into evidence in the trial record. *Ibid.*

driving around looking for "Reek" (TYREEK LYONS), "Haj" (HAJ WASHINGTON), and "16" (ELIJAH JONES). SPARKLE noted that ELIJAH was in the house, but she believes that he had just been out with TYREEK and TERRELL CASTILE. SPARKLE explained that about 6 minutes after she got the call from FATIMAH, she heard the gun shots from Cherry Street.
Exhibit C-177.

In addition, Defendant was provided a statement from Christina Powell-Williams that detailed the confrontation that occurred before the shooting. N.T. Post-Trial Conference, 3/21/19 at 8-9. The relevant portion of her statement, marked as the Commonwealth's trial exhibit 198,[7] is as follows:

Q: Can you tell us what happened last night that made you report to the Norristown Police Department in person to get help?

A: Last night, around 10:30 PM, I was parked in my truck, it's a gold Expedition, with my cousin Trina Wright. I was parked on Cherry Street, at Marshall Street, a couple doors down from the Golden Dragon. I saw four boys, they looked like teenagers, they passed my truck on Cherry walking towards Airy. They walked by my passenger side, my windows were down. They seemed upset, they appeared angry. Whatever they said, my cousin said to them, "Be safe." They didn't respond, they kept walking. 1 just felt that something wasn't right. We were still sitting in the truck talking, and like three or four minutes later, another set of boys walk by the passenger side of my truck, they come from behind and were walking toward Airy. There were three boys walking in the front of this pack, either three or four walking behind them, they all appeared together. They all had black hoodies on, except for one boy who had on a grey hoodie, they all had their hoodies up. They stopped, they are behind my truck. I hear one boy say something like "I am not going far down, I'm am trying to shoot from here." I heard someone say something Pottstown, I heard the word Pottstown really loud. They started walking past me towards Airy.

. . .

Q: What happens next?

[7] Defendant acknowledged receipt of this statement in discovery on January 2, 2018. N.T. Post-Trial Conference, 3/21/19 at 8. Exhibit C-198 was marked as a trial exhibit, but was never admitted into evidence in the trial record.

22

A: I couldn't park in the same spot so I park on Marshall Street. I go back on Cherry Street where my cousin are her neighbors are. I see a car, it was greenish, or gray, tinted windows, I initially though it was police car but heard rap music and the car set up higher so I figured it wasn't a police car. I have seen the car at least five or six times circling Cherry Street, came different ways. The car was all over the place. . .
Exhibit C-198.

Defendant alleges that the Commonwealth never disclosed Lyons' unrecorded and un-memorialized conversation with detectives referenced by Lieutenant Dillon at the sentencing hearing, in violation of Pa.R.Crim.P. 573. Pa.R.Crim.P. 573 states the following regarding disclosure by the Commonwealth:

> (1) *Mandatory.* In all court cases, on request by the defendant . . . the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
>> a. Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;

Contrary to Defendant's claims, the evidentiary hearings established the following information was provided to defendant months prior to trial:

a) Kendal Rosendary was considered as a mistaken identity victim and the possible intended targets were Tyrique Lyons, Elijah Jones, Terrell Castile, and Haj Washington. Norristown v. Pottstown Gun Violence Timeline, Exhibit C-176.
b) Elijah Jones' mother, Sparkle Jones, provided a statement to police where she:
    a. noticed an Impala circling the block,
    b. received a phone call from her son's girlfriend that some boys were driving around looking for her son and Haj Washington,
    c. stated that her son was in the house when she received that call and believed he had just been out with Tyrique Lyons and Terrell Castile, and
    d. heard gunshots about six minutes after receiving that phone call. Email regarding Sparkle Jones, Exhibit C-177.
c) Christina Powel-Williams provided a statement to police where she observed:
    a. the green Impala circling Cherry Street five to six times,
    b. groups of teenage boys walking the streets of Norristown where one group appeared "upset" and "angry," and

23

c. one person from another group with hoodies stating, "I am not going far down. I'm am trying to shoot from here." Powell-Williams Statement, Exhibit C-198.

It is clear that the only "new" evidence not provided to Defendant was Lieutenant Dillon's statement that Lyons, Jones, and Washington had a confrontation with defendant forty-five minutes before the shooting and were hiding in the park before, not at the time, of the shooting. Defendant claims a Rule 573 violation even though Lieutenant Dillon did not memorialize the conversation with Lyons.

A claim of discovery violation is reviewed as follows:

> If a discovery violation occurs, the court . . . may enter any order it deems just under the circumstances. The trial court has broad discretion in choosing the appropriate remedy for a discovery violation . . . A defendant seeking relief from a discovery violation must demonstrate prejudice. A violation of discovery "does not automatically entitle appellant to a new trial." Rather, an appellant must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure.

*Commonwealth v. Brown*, 200 A.3d 986, 993 (Pa. Super. 2018) (citing *Commonwealth v. Causey*, 833 A.2d 165, 171 (Pa. Super. 2003)) (citations omitted). Defendant claims he was prejudiced by the late information because it "would have allowed us [the defense] to create a plausible scenario of self-defense that we otherwise lacked." *See* N.T. Post Sentence Motion Hearing at 69 (June 3, 2019). The Defendant had ample opportunity to develop the theory of his case as he was aware of the other intended victims prior to trial. Defendant clearly knew from the Norristown versus Pottstown timeline that Lyons, Washington, and Jones were "possible intended targets" of the shooting. Exhibit C-176. The additional details provided by Lieutenant Dillion could have been discovered by defense counsel's own due diligence. "Where the evidence is equally accessible or inaccessible to both the Commonwealth and the defense, the

24

defense cannot use the discovery rules against the Commonwealth for its failure to produce the evidence." *See Commonwealth v. Santos*, 176 A.3d 877, 883 (Pa. Super. 2017) (citing *Commonwealth v. Dent*, 837 A.2d 571, 585 (Pa. Super. 2003)). In spite of Defendant's claims, the record is clear that Defendant was provided with documentation months before trial that Lyons, Washington, and Jones were Defendant's intended targets, that a confrontation occurred between young men from Pottstown and Norristown before the shooting, and that Jones' mother saw an Impala circling the block before the shooting. The only "new" information not previously disclosed was that Lyons, Washington, and Jones were in the park near the shooting before Rosendary was shot.

Defendant's claim that Lieutenant Dillon had a duty to memorialize the Lyons oral statement lacks merit. In *Commonwealth v. Small*, 741 A.2d 666 (Pa. 1999), police officers failed to record oral conversations with witnesses that occurred before the witnesses were interviewed on tape in a murder and rape investigation. *Small*, 741 A.2d at 441. The appellant in *Small* argued that the Commonwealth was required to produce evidence of these oral conversations to the defense. *Id.* The Court held that the police had no duty to reduce to writing an interview with a potential witness. *See id.* at 676-77 (finding that police's failure to record oral conversations with potential witnesses was not a *Brady* violation). Subjecting the police "to tape every conversation between police investigators and *potential* witnesses or to take detailed notes of all activity on every investigation . . . is not a realistic or necessary requirement to impose on the police." *Id.* at 677.

Defendant's discovery violation claim lacks merit and does not warrant a new trial.

25

### b. *Brady* Violation

The Defendant alleges the Commonwealth committed a *Brady*[8] violation. The Defendant must prove the following three requirements to succeed on a *Brady* claim: "(1) evidence was suppressed by the prosecution; (2) the evidence, whether exculpatory or impeaching, was favorable to the defendant; and (3) prejudice resulted." *See Commonwealth v. Cousar*, 154 A.3d 287, 301 (Pa. 2017) (citing *Commonwealth v. Daniels*, 104 A.3d 267, 284 (Pa. 2014)). "There is no *Brady* violation when the appellant [the defense] knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from non-governmental sources." *Commonwealth v. Paddy*, 15 A.3d 431, 451 (Pa. 2011); *See Commonwealth v. Rhodes*, 54 A.3d 908, 914 (Pa. Super. 2012) (finding no *Brady* violation where appellant failed to use reasonable diligence to uncover contact information and whereabouts of witnesses who had potentially exculpatory information).

Here, Defendant knew the identity of the intended victims, but failed to use reasonable diligence to interview or further investigate their whereabouts at the time of the shooting. The information provided to Lieutenant Dillon, Detective Sowell, and Detective Leeds by Lyons was accessible to the Defendant through non-governmental sources. Moreover, the police are under no duty to reduce to writing every interview they conduct during the course of an investigation. *See Small*, 741 A.2d at 676-77. The fact that the police's conversation with Lyons was not reduced to writing does not amount to suppression of evidence. No evidence was suppressed by the Commonwealth.

In order to establish prejudice, the suppressed evidence must be material to Defendant's guilt or punishment, meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Commonwealth*

---

[8] *Brady v. Maryland*, 373 U.S. 83 (1963).

26

*v. Tharp*, 101 A.3d 736, 747-48 (Pa. 2014) (citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (2014); *See Commonwealth v. Natividad*, 200 A.3d 11, 26 (Pa. 2019) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). The inquiry regarding reasonable probability is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 748 (citing *Commonwealth v. Weiss*, 986 A.2d 808, 815 (Pa. 2009)). Without the evidence regarding the details surrounding the other intended victims, the evidence against the Defendant was overwhelming to sustain the jury's verdict. Defendant posted on social media on several occasions his desire to get revenge for Jordan Scott's murder, stating "Death is never a option or planned but revenge is." T5 1044-1045. Other posts included Defendant characterizing himself as a "monster" after Jordan Scott's death and wanting to "grab bigger guns" in retaliation. T5 1047, 1146-47. Defendant's cell phone contained numerous videos and images showing Defendant's access to firearms. T5 1024-1030; 1033. Images from Defendant's phone, time stamped August 7, 2017, the day before the shooting, showed multiple firearms on a person's lap. T5 1024-1026. Another image from Defendant's phone, time stamped on the date of the shooting, showed a revolver that resembled the revolver that was recovered from the backseat of co-defendant Jones' Impala. T5 1033; 1079. The revolver contained six fired cartridge casings in its cylinder. T4 783-84. Expert testimony from Detective Nelson revealed that bullets and bullet fragments that were recovered from the scene were consistent with having been fired from a .38 Special caliber revolver like the one discovered in co-defendant Jones' Impala. T4 800-801. DNA evidence establishes the extremely high likelihood of Defendant's culpability. DNA swabs taken from the grip of the .38 Special

27

caliber revolver found in the back of co-defendant Jones' car contained a mixture from at least three individuals and it was nineteen thousand six hundred sixty (19,660) times more likely that Defendant was one of those individuals. T5 983-987. Moreover, Defendant admitted to shooting a revolver multiple times. T5 1128. Defendant fled, first in co-defendant Jones' car, and then on foot. T5 1092-1093. Defendant was eventually found hiding in the backyard of a property in Norristown. T2 173. Defendant received a fair trial in the absence of the additional details provided by Lieutenant Dillion and did not suffer any prejudice.

The Defense contends that with the additional information provided by Lieutenant Dilion, the "[d]efense could have put forward plausible alternative suspects who may have possessed the two missing firearms that were not recovered at the scene of the shooting." *See* Defendant's Post Sentence Motion for Evidentiary Hearing and New Trial at 8. However, *Brady* does not "require the disclosure of information 'that is not exculpatory but might merely form the groundwork for possible arguments or defenses.'" *Paddy*, 15A.3d at 451 (citing *Commonwealth v. Lambert*, 884 A.2d 848, 856 (Pa. 2005)) (finding no *Brady* violation where the Commonwealth did not disclose police reports appellant alleged "would have alerted trial counsel to the existence of an alternative theory as to who killed [the victim] and why"). The fact that three other intended victims had a confrontation with the Defendant prior to the shooting is not exculpatory information and it supports the Commonwealth's theory that Defendant came to Norristown with the intent to kill. The only new information not previously disclosed to Defendant was Lieutenant Dillon's testimony (not reduced to writing) indicating that Lyons, Jones, and Washington were in the park before the shooting began. The record in the case does not support that any part of the three prong test under *Brady* has been established. Defendant's *Brady* violation claim lacks merit.

28

### c. After-Discovered Evidence

The Defendant claims the court erred in denying a new trial on the ground of after-discovered evidence. A new trial on the basis of after-discovered evidence that is producible and admissible is warranted if the evidence:

> (1) could not have been obtained prior to the end of trial with the exercise of reasonable diligence; (2) is not merely corroborative or cumulative evidence; (3) is not merely impeachment evidence; and (4) is of such a nature that its use will likely result in a different verdict on retrial.

*Commonwealth v. Lyons*, 79 A.3d 1053, 1068 (Pa. 2013). Here, the evidence could have been obtained by the defense with reasonable diligence prior to the end of trial. The defense knew the identities of the intended victims but failed to interview or further investigate any further information they may have had. Additionally, the evidence is merely corroborative. Defendant's post-sentence motion acknowledges its corroborative nature: "The evidence would bolster and corroborate from an independent source the Defendant's trial testimony that there was a face to face confrontation between Norristown and Pottstown groups prior to the shooting." *See* Defendant's Post Sentence Mot. for Evidentiary Hearing and New Trial at ¶ 39. Lastly, this alleged new evidence is highly unlikely to result in a different verdict if the case were retried. As discussed previously in Part 1(b), *Brady* violation, the remaining evidence against the Defendant is overwhelming. The evidence established Defendant's intention of coming to Norristown in order to commit a revenge murder and does not warrant a new trial. *See Lyons*, 79 A.3d at 1069 (affirming trial court's denial of new trial for after-discovered evidence "given the overwhelming remainder of the evidence inculpating Appellant"). Again, the only after-discovered evidence is Lieutenant Dillon's testimony that the intended victims were in proximity of the shooting before

– and not during – the shooting. Defendant's claim for a new trial based on after-discovered evidence lacks merit.

#### d. Supplementary Post-Sentence Motion for Production of Witnesses

Defendant claims the court erred in denying Defendant's Supplementary Post-Sentence Motion for the Production of Witnesses pursuant to Defendant's right to confrontation. *See* Def.'s Supp. Post-Sentence Motion for the Production of Witnesses. Defendant requested the court "order a writ of habeas corpus ad testificandum [ ] for Tyrique Lyons and Haj Washington, that the Commonwealth provide a current address for Kendall Rosendary to Defendant, and that a material witness warrant be issued for Elijah Jones, or other relief as appropriate." Def.'s Supp. Post-Sentence Motion for the Production of Witnesses, at 5. The court denied Defendant's request. *See* Order, 3/25/19.

Defendant was not entitled to the production of witnesses at the post-trial evidentiary hearing since he failed to satisfy his burden for their production. A post-sentence motion for evidentiary hearing "must, at the very least, describe the evidence that will be presented at the hearing" without "[s]imply relying on conclusory accusations made by another, without more . . ." *Commonwealth v. Castro*, 93 A.3d 818, 827 (Pa. 2014) (finding that an article alleging police officer's misconduct that referenced individuals "who may have been relevant witnesses in the end" did not warrant an evidentiary hearing). Defendant's claim of "new evidence" from Lieutenant Dillon's testimony did not warrant the production of witnesses at a post-sentence hearing. The statements made by Lieutenant Dillon were are not inherently exculpatory in nature or corroborating of Defendant's theory of self-defense. Rather, they were corroborative of the Commonwealth's case that the Pottstown group came to Norristown to seek revenge for the Jordan Scott murder. These statements alone did not entitle Defendant to the production of

30

witnesses. As the Supreme Court stated in *Castro*, the purpose of an evidentiary hearing is as follows:

> [T]he hearing is for the presentation of evidence, not the potential discovery of evidence. 'An evidentiary hearing . . . is not meant to function as a fishing expedition for any possible evidence that may support some speculative claim' . . . There must be actual discovery of actual evidence. The relevant motion is not to serve as a preemptive means of securing a hearing that will itself comprise the investigation . . . [One must] clearly articulate in his motion what evidence he would present to meet the test.

*Castro*, 93 A.3d at 827-28 (citing *Commonwealth v. Scott*, 752 A.2d 871, 877 n.8 (Pa. 2000)).

Moreover, Defendant did not proffer the witness's anticipated testimony in his motion. Defendant's motion acknowledged that Elijah Jones spoke to Defendant's counsel over the phone and stated "I don't want to help him, he tried to shoot me" and refused to testify. Def.'s Supp. Post-Sentence Motion for the Production of Witnesses at 4.

Defendant's counsel stated he would ask the following questions to Lyons, Jones, and Washington if they were produced at an evidentiary hearing:

> "THE COURT: I mean, you tell me how the examination is going to proceed.
>
> MR. KOSCHIER: Mr. Jones, did you speak with Lieutenant Dillon; yes or no? Mr. Jones, did you, in fact, make a statement to Lieutenant Dillon admitting to being present at the scene prior to the scene of the shooting? Did you hear any shots? What did you see? Can you tell me what you saw? Can you tell me about your confrontation prior to the shooting? Can you tell me what you told the police?" N.T. Post-Trial Conference, 3/21/19 at 35.

Defendant sought an evidentiary hearing to investigate his claim further rather than present "actual evidence." Defendant failed to satisfy his burden to compel the production of witnesses. The court properly denied Defendant's request for the production of witnesses.

31

### e. Motion to Quash Subpoena

Defendant claims the court erred in granting Elijah Jones' Motion to Quash Subpoena, filed on April 2, 2019 by Elijah Jones' counsel. Defense counsel served a subpoena on Elijah Jones on January 24, 2019 for his appearance on April 3, 2019 for the scheduled evidentiary hearing. Elijah Jones filed a motion to quash the subpoena to testify at the post-sentence hearing on May 10, 2019. Elijah Jones' counsel invoked his client's Fifth Amendment right against self-incrimination and the court quashed the subpoena. N.T. Post-Sentence Motion Hearing, 5/10/19 at 6-7.

"Typically, the standard of review regarding a motion to quash a subpoena is whether the trial court abused its discretion." *Commonwealth v. McClure*, 172 A.3d 668, 683 (Pa. Super. 2017); *See Commonwealth v. Mucci*, 143 A.3d 399, 411-12 (Pa. Super. 2016) ("So long as there is evidence which supports the trial court's decision, it [a decision to quash or enforce a subpoena] will be affirmed."). Compelling Elijah Jones to testify in this proceeding would be a violation of his Fifth Amendment right against self-incrimination. Jones argued that Defendant was planning to question Elijah Jones on his involvement in the shooting of Rosendary and implicate him as an alternative defendant in the case. N.T. Post-Sentence Motion Hearing, 5/10/19 at 4.

At the time of the hearing, Elijah Jones had an open criminal charge against him for possession with intent to distribute a controlled substance. *Id.* at 5. If forced to testify, it could have also compromised his legal position in the open case. *Id.* at 3. The court found sufficient factual basis in Elijah Jones' assertion of his Fifth Amendment privilege and granted his motion to quash subpoena. *See Commonwealth v. Treat*, 848 A.2d 147, 148 (Pa. Super. 2004) (citing *Commonwealth v. Kopicz*, 840 A.2d 342, 350 (Pa. Super. 2003) ("The privilege extends not only

32

to statements that by themselves would be evidence that the declarant has committed a crime, but also to assertions that would be 'a link in the chain' of evidence needed to convict."); *See Commonwealth v. Cook*, 856 A.2d 869, 876 (Pa. Super. 2004) (citing *Commonwealth v. Simmons*, 719 A.2d 336, 340 (Pa. Super. 1998) ("When reviewing a court's disposition of a motion to quash a subpoena, we grant great deference to the factual findings of the trial court."). The motion to quash subpoena was properly granted.

## 2. Expert Testimony – Detective Edward Schikel

Defendant claims the court erred by overruling Defendant's objections to the Commonwealth's questions of its expert witness Edward Schikel. T4 697; 720; 722. Detective Edward Schikel was qualified as an expert witness in the field of forensic crime scene analysis. T4 687. Detective Schickel was employed at the Montgomery County Detective Bureau in the Forensic Services Unit for nine years. T4 674-75. He had previously spent fifteen years with the City of Philadelphia, eight of which were in the Crime Scene Unit either as a police officer or supervisor. T4 675. During his time in the Crime Scene Unit, he underwent training in the forensic identification lab and the Firearms Identification Unit. T4 676. Detective Shickel also received training in identifying bullet strike marks. T4 676-678. Over the course of his career, he has investigated hundreds of crime scenes, the majority of which were homicide cases. T4 678. Defendant did not object to Schikel's qualification as an expert in this field. *Ibid.* "[T]he admissibility of expert testimony is vested within the sound discretion of the trial court and will not be overturned unless the trial court commits an abuse of that discretion." *Commonwealth v. Galvin*, 985 A.2d 783, 801 (Pa. 2009).

Defendant objected to the following question on direct examination concerning the direction that fired cartridge casings eject from a semiautomatic weapon.

> Q: If you are firing a semiautomatic in a normal function, is there a tendency for the fired cartridge casings to eject in a certain direction?
>
> MR. KOSCHIER: Objection, Your Honor outside the witness's area of expertise.
>
> MS. KEMP: Your Honor, the witness testified that he could testify to that if you're asking about specifically identifying if this is a .45 caliber.
>
> THE COURT: Overruled. Overruled as to this question.
> T4 697.

Schikel's expertise in crime scene analysis rendered him qualified to provide testimony on the typical direction of ejected cartridge casings when fired from a semiautomatic weapon in a normal fashion. Schikel's seventeen years of crime scene experience and extensive training in the field qualified him to answer such a general question. The objection was properly overruled.

Defendant also claims the court erred by overruling his objection to two Commonwealth questions to Schikel concerning the direction of gunfire. The following two questions were timely objected to:

> Q: So if that vehicle is driving with the flow of traffic or parked with the flow of traffic driving northbound on that side of the sidewalk, is what you observed with respect to that vehicle still consistent with the bullets being fired in the direction of where the blood trail was located?
>
> MR. KOSCHIER: Objection, Your Honor.
>
> THE COURT: Basis?
>
> MR. KOSCHIER: It's outside the area of his expertise.
>
> THE COURT: No. No. Overruled.
> Again, ladies and gentlemen, this is a hypothetical question. Therefore it assumes that the underlying factual predicate is in evidence and you accept that as true.
> You may continue.

34

. . .

Q: If that vehicle for this scenario is actually parked and the individuals exit that vehicle and begin shooting in the direction of the blood trial, is that consistent with the physical evidence you observed on the front of that Chevy Impala as well as the passenger's side?

A: Depending where they exit.

MR. KOSCHIER: Your Honor, I am going to renew my objection generally.

THE C[OU]RT: Overruled.
T4 720-722.

Here, the underlying facts of the location of the blood trail and the location of the strike marks on the Chevy Impala were already of record. T3 534-540; 570-71; T4 720. *See Commonwealth v. Galvin*, 985 A.2d 783, 801 (Pa. 2009) ("The use of hypothetical questions is proper when there is evidence of record supporting the hypothetical."). The hypothetical question was posed to "focus[ ] the witness' expertise onto the narrow issue under consideration" – whether the fired bullets were coming from the direction of the vehicle to the area where the victim was found. *Commonwealth v. Leaner*, 202 A.3d 749, 774 (Pa. Super. 2019) (quoting *Ranieli v. Mutual Life Ins. Co.*, 413 A.2d 396, 398 (Pa. Super. 1979)). This issue is well within Schikel's area of expertise of analyzing evidence found at a crime scene, such as fired cartridge casings and bullet strike marks, and narrowed the scope of the shooters' positions while shooting a firearm. T4 684-685. The Commonwealth's crime scene expert testified within the scope of his expertise. The Defendant's objections were properly overruled.

### 3. Identification Testimony

Defendant claims the court erred by overruling Defendant's objection at trial to certain testimony by Officer Licwinko in violation of Defendant's pretrial discovery rights pursuant to

35

Pa.R.Crim.P. 573. During a pretrial hearing held on October 16, 2018, the Commonwealth proffered testimony from Officer Licwinko that he had seen Defendant in Pottstown before the shooting. N.T. Motion in Limine II, 10/16/18, at 335. Defendant contended that Officer Licwinko's anticipated trial testimony constituted an "identification" and should be precluded under Rule 573. *Id.* at 337. The court denied defense's request for a continuance. *Ibid.* At trial, Defendant objected to the Commonwealth's question to Officer Licwinko: "Had you previously observed Davis in the area of Pottstown?" T5 913. Defendant's counsel argued as follows:

> Your Honor, I previously requested a continuance on this during pretrial motions in this case, but your Honor denied it. There's case law that stands for the proposition that the Commonwealth has an obligation to provide identification testimony to the defense, even if they're going to be calling prior officers related to separate criminal incidents, if they're going to connect those criminal incidents to the incident at issue.
> Because the Commonwealth did not provide this discovery to us sufficiently in the advance of trial to allow us to rebut and, further, we weren't given a continuance request, I am now, for the record, stating that this evidence should not be permitted at trial.
> T5 914.

The Commonwealth proffered that Officer Licwinko would testify that he knew Defendant associated with members of the groups ATM and BGB. T5 915-916. The court overruled Defendant's objection to the specific question of whether the witness had seen Defendant in Pottstown. T5 918. The court limited the testimony to the witness's personal and factual observations only.[9] T5 918-919. The court further ordered "that the officer can't testify as to prior criminal conduct or behavior by the defendant." T5 922. Defense counsel did object to the limited scope of Office Licwinko's testimony thereafter. T5 920-922.

---

[9] The Court reviewed a memorandum addressed to the Commonwealth's attorney Kristen Kemp dated October 23, 2018 written from Officer Licwinko which, *inter alia*, identified certain individuals as gang members. The court did not permit Officer Licwinko to testify about the identities of gang members in accord with his memo. T5 918-19.

36

Rule 573 states that the Commonwealth must provide a defendant's attorney with information regarding "the circumstances and results of any identification of the defendant by voice, photograph, or in-person identification." Pa. R. Crim. P. 573(B)(1)(d). The Comment to Rule 573 provides the following:

> Whenever this rule makes reference to the term 'identification' or 'in-person identification,' it is understood that such terms are intended to refer to all forms of identifying a defendant by means of the defendant's person being in some way exhibited to a witness for the purpose of an identification, *e.g.*, a line-up, stand-up, show-up, one-on[ ]-one confrontation, one-way mirror, *etc.*"

*Commonwealth v. Honesty*, 850 A.2d 1283, 1286 (Pa. Super. 2004) (quoting *Commonwealth v. Jennings*, 630 A.2d 1257, 1260 (Pa. Super. 1993)); *See also* Pa. R. Crim. P. 573. Here, Officer Licwinko's testimony regarding whether he had seen Defendant in the Pottstown area is not an "identification" in the context of Rule 573. The witness's testimony was based on his personal observations of the Defendant, and not the product of an identification process where Defendant was presented to the witness "for the purpose of identification." *Honesty*, 850 A.2d at 1287 (finding that witness's in-court identification of shooter was not subject to Rule 573 mandatory disclosure). Officer Licwinko's "identification" of Defendant was not in the context of recognizing him as the shooter, but rather identifying him as someone from Pottstown who was seen with other persons. The Commonwealth did not violate Rule 573 and Defendant's objection was properly overruled.

### 4. Defendant's Request for Mistrial for Prejudicial Statements

Defendant claims the court erred in denying Defendant's request for a mistrial after Detective Mazza made prejudicial statements during the Commonwealth's cross examination. T5 1085-87. On direct examination by Defendant, Detective Mazza testified there was a different shooting that occurred on the night of August 7, 2017 where no arrests were made in connection

37

with that shooting. T5 1084. This other shooting was also investigated as related to the Jordan

Scott murder. T5 1085. During cross examination by the Commonwealth, Detective Mazza

testified as follows:

Q: In reviewing your report, did it state that this was investigated as a part of the recent Norristown shootings related to the Jordan Scott murder?

A: Yes

Q: And there is a current Pottstown versus Norristown beef?

A: Yes, ma'am.

Q: And were you aware that although no individuals were arrested, that there were fired cartridge casings recovered?

A: Yes, there were casings recovered.

Q: A .40 caliber and a 9 millimeter?

A: Yes.

Q: And that the possible suspects --

MR. KOSCHIER: Objection, Judge.

THE COURT: Sustained.

BY MS. KEMP:
Q: Were you aware of potential suspects that --

MR. KOSCHIER: Objection.

BY MS. KEMP:
Q: -- were considered?
MS. KEMP: Your Honor, I am not naming names at this point.

MR. KOSCHIER: Objection.

THE COURT: Just a second. Just a second. This is a question calling for a yes-or-no answer.

MS. KEMP: Yes, Your Honor.

THE COURT: I will allow that question.

BY MS. KEMP: Were you aware of there being potential suspects that were being investigated for the August 7th of 2017 shooting?

A: Yes, ma'am.

Q: Is it fair that the individuals who were shot at were non cooperative?

A: Yes, ma'am.

Q: Were the individuals that were suspects arrested at some later point for a different shooting?

A: They were.

Q: Were they arrested the following day or in the early morning hours?

MR. KOSCHIER: Objection, Your Honor.

MR. GENOVESE: Objection, Your Honor.

THE COURT: Sustained.

MR. KOSCHIER: I move for a mistrial.

THE COURT: Denied. But I will listen to you at the end of the day if you want to amplify your request.

MS. KEMP: Your Honor, I have nothing further. And I will obviously stipulate that no individual was arrested with respect to that.
T5 1085-87.[10]

The denial of a mistrial is reviewed as follows:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the

---

[10] Defendant did not amplify his request for a mistrial as permitted by the court.

> jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

*Commonwealth v. Rega*, 933 A.2d 997, 1016 (Pa. 2007). Moreover, an abuse of discretion occurs when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will as shown by the evidence of record." *Commonwealth v. Tejeda*, 834 A.2d 619, 624 (Pa. Super. 2003) (quoting *Commonwealth v. Garcia*, 661 A.2d 1388, 1394-95 (Pa. Super. 1995).

Here, Defendant opened the door to this line of inquiry by first asking Detective Mazza about a different shooting the day before the Rosendary shooting. T5 1084. The Commonwealth's questions on cross-examination were within the scope of the direct examination initiated by Defendant. However, no specific names were elicited by the Commonwealth in connection to this other shooting. T5 1085-1086. *See Commonwealth v. Simpson*, 174 A.2d 1264, 1273 (Pa. 2000) (affirming trial court's denial of mistrial where witness vaguely introduced propensity evidence). The Court found that the testimony did not "prevent the jury from fairly examining the entirety of the evidence and rendering a true verdict." *Simpson*, 174 A.2d at 1272. Testimony that there were no arrests for a separate shooting that occurred on the previous day as well as testimony that unidentified suspects for the separate shooting were later arrested for another crime did not suggest Defendant in this case was involved in that other incident. The Defendant was not deprived a fair trial through introduction of Detective Mazza's testimony. Defendant's request for a mistrial was properly denied.

### 5. Prior Recorded Statement

The Defendant claims the Court erred by denying Defendant's request for the entirety of a prior recorded statement to be introduced at the time of the Commonwealth's questioning pursuant to Pa.R.E. 106. T5 1125-27. At trial, the Commonwealth questioned the Defendant

40

regarding his testimony at a suppression hearing on October 16, 2018 regarding his post-arrest statement to police on August 9, 2017. T5 1122-1128. The Commonwealth introduced the notes of testimony from the suppression hearing at trial as C-124. T5 1122-1123. The prosecutor asked the Defendant about his testimony at the suppression hearing as follows:

> Q: On Page 193, do you recall being asked the question, What was your state of mind regarding what you wanted to do at that moment? And do you recall giving the answer, Just go home. I had nothing to do with it?
>
> A: That was my statement made, yes.
>
> Q: That was your testimony on October 16 of 2018?
>
> A: Yes. Regarding my statement made on August 9th.
>
> Q: And you were further asked, Question: Did you said you wanted to go home because you had nothing to do with it; is that correct? And you gave the answer, Yes?
>
> A: That's my state of mind, yes. That's how I was feeling.
>
> Q: That you had nothing to do with it?
>
> A: Yes. That's my state of mind.
>
> Q: So October 16 of 2018, you would agree, is way after August of 2017. At that point in time, you're still not saying it was self-defense?
>
> A: That was regarding my statement, ma'am.
>
> Q: You had nothing to do with it, is what you testified to on –
>
> MR. KOSCHIER: I am going to object, Your Honor, to this. The entire statement is out of context.
>
> THE COURT: You can ask questions on redirect so you have more of a context.
>
> . . .

41

BY MS. KEMP:
Q: On October 16, 2018, you testified that you had nothing to do with any of it; is that correct?

MR. KOSCHIER: I am going to object on the same basis.

THE COURT: Overruled.
T5 1123-24, 1127.

If one party introduces all or part of a writing or recorded statement, Pa.R.E. 106 allows an adverse party to introduce any other writing or part of a writing "that in fairness ought to be considered at the same time." Pa.R.E. 106. The comment to Pa.R.E. 106 states the following:

> The purpose of Pa.R.E. 106 is to give the adverse party an opportunity to correct a misleading impression that may be created by the use of a part of a writing or recorded statement that may be taken out of context. This rule gives the adverse party the opportunity to correct the misleading impression at the time that the evidence is introduced. The trial court has discretion to decide whether other parts, or other writings or recorded statements, ought in fairness to be considered contemporaneously with the proffered part.

Defendant's counsel had ample opportunity on re-direct examination to establish the context for Defendant's statement to police.[11] *See Commonwealth v. Bryant*, 57 A.3d 191, 196 (Pa. Super.

---

[11] On re-direct, Defendant testified as follows in response to his counsel's questions:
BY MR. KOSCHIER:

Q: One quick question for you: When ADA Kristen Kemp was talking about how you were – You said at one point this past month, in October, that I didn't have – something about what you said, and it seemed like you were not talking about self-defense. Do you recall what that hearing was about?
A: The hearing was about suppression issues.
Q: It was just about whether or not police had coerced you in some way, right?
A: Yes, sir.
Q: It had nothing to do with anything else, correct?
A: Yes, sir.
Q: In fact, you had been instructed not to talk about other things because that would have caused issues, correct?
[MS. KEMP:] Objection; leading.
THE COURT: Yeah. Sustained. Rephrase the question, please.
BY MR KOSCHIER:
Q: Would that have been the right place for you to talk about anything else?
MS. KEMP: Objection?
THE WITNESS: NO, sit.

42

2012) (affirming trial court's denial of entirety of diary, instead of one page of diary, to be admitted at trial where appellant did not satisfy burden of proving the relevancy of the entirety of the diary was not an abuse of discretion). The court found it more appropriate for defense counsel to establish the context of Defendant's statement to police during his redirect examination. T5 1124-1125. The jury was not misled. The court properly overruled defendant's objection.

### 6. Frye Hearing

Defendant alleges the court erred in denying Defendant's pre-trial motion for a *Frye* hearing pursuant to Pa.R.E. 702. Defendant challenged the use of DNA testing that creates "likelihood ratio" evidence. *See* Def.'s Supp. Omnibus Pretrial Motion, at 8. The Commonwealth's expert report from NMS Labs states the following regarding likelihood ratios:

> The likelihood ratio (LR) compares the relative support of two competing hypotheses under a specific set of assumptions. LR values can range from 0 to infinity. Alternate hypotheses and/or assumptions will typically change the LR value. An LR is not the probability that the underlying assumptions of either hypothesis are true/false.
> Motions in Limine II, 10/16/18, Exhibit C-10.[12]

The expert report concluded that Defendant's DNA was one of five individuals whose DNA was found on the grip of a revolver found in Co-Defendant's Impala with a 19,660[13] to 1 likelihood ratio that Defendant's DNA is included as one of those individuals. *See* Def.'s Supp. Omnibus Pretrial Motion, at 8; N.T. Motions in Limine II, 10/16/18 at 219. Defendant challenged the Commonwealth's use of "likelihood ratio" evidence as a novel science, questioning the

---

THE COURT: Overruled.
MR. KOSCHIER: No further questions.
T5 1159-60.

[12] The expert report was admitted into evidence as exhibit C-10 at the motion in limine hearing held on October 16, 2018. Motions in Limine II, 10/16/18 at 209. The report was not admitted into evidence at trial as the parties entered into a stipulation regarding the DNA evidence. T5 986.

[13] Defendant used the ratio "19,660 to 1" in his pretrial motion, but erroneously used the ratio "19,680 to 1" at the pretrial hearing. *See* N.T. Motions in Limine II, 10/16/18 at 219.

methodology used to determine its conclusions. N.T. Motions in Limine II, 10/16/18 at 219-220. The court denied the request for a Frye hearing. *See* Order, 10/17/18. Based upon the court's ruling, the parties stipulated at trial that the DNA swabs taken from the grip of the .38 Special caliber revolver found in the back of co-defendant Jones' Chevy Impala contained a mixture from at least three individuals and was nineteen thousand six hundred sixty (19,660) times more likely that Defendant Davis was one of those individuals. T5 986.

Pa.R.E. 702 allows a qualified expert witness to opine at trial if "the expert's methodology is generally accepted in the relevant field" (the *Frye*[14] test). Pa.R.E. 702; *See Commonwealth v. Jacoby*, 170 A.3d 1065, 1090 (Pa. 2017) ("The Frye standard . . . is used to determine the admissibility of novel scientific evidence, and is incorporated into Rule 702."). In order to trigger a *Frye* hearing, the party opposing the scientific evidence must prove its novelty by showing "that there is a legitimate dispute regarding the reliability of the expert's conclusions." *Commonwealth v. Cramer*, 195 A.3d 594, 606 (Pa. Super. 2018) (citing *Commonwealth v. Safka*, 95 A.3d 304, 307 (Pa. Super. 2014)). A *Frye* hearing is not necessary every time a party seeks to admit scientific evidence, but "is warranted only when the trial court 'has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions.'" *Jacoby*, 170 A.3d at 1090. (citing *Commonwealth v. Walker*, 92 A.3d 766, 790 (Pa. 2014)) (affirming trial court's denial of a *Frye* hearing where Defendant was unable to prove that the methodology used in creating Y-STR DNA evidence through the use of DNA databases was novel as Defendant's arguments countered the weight of the evidence and not methodology used).

---

[14] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

44

Defendant argued the following at a motion in limine hearing on October 16, 2018:

> Specifically that [likelihood ratio evidence] is going to be presented to the jury. They're going to be told that a likelihood ratio of 19,680 to 1, the defendant's DNA is that DNA, one of those five individuals' on the grip of that gun. That's really important. And exactly how that came to that determination, to my knowledge, has not been tested in the same way DNA has. And that's not something that has been accepted in the scientific community, because it is a protected trade secret of sorts. I believe the Commonwealth should be required to show that a 19,680 to 1 ratio is actually representative of what the actual likelihood is and what room for error there may be. But they should at least be able to be forced to establish that that is a valid science, Your Honor. N.T. Motions in Limine II, 10/16/18 at 219-220.

Defendant did not set forth "articulable grounds" challenging the methodology how likelihood ratio evidence is created. *Cramer*, 195 A.3d at 607 (finding that appellant did not provide "articulable grounds" to show that a licensed psychologist did not use accepted scientific methods in reaching her conclusions where psychologist relied on her firsthand experience and research in drawing her conclusions). Rather, Defendant broadly asserted that it is not generally accepted in the relevant field because it is a "trade secret of sorts" without any further explanation. N.T. Motions in Limine II, 10/16/18 at 219. Defendant did not present any evidence or make a sufficient showing of the type of system, theory, or general methodology that he claims is not generally accepted in the scientific community. He did not meet his burden to prove the need for a *Frye* hearing. See *Commonwealth v. Foley*, 38 A.3d 882, (Pa. Super. 2012) (finding a method used to create likelihood ratio evidence called "TrueAllele" was not novel); *Commonwealth v. Treiber*, 121 A.3d 435 (Pa. 2015) (likelihood ratio accepted to prove hair came from appellant's dog). Defendant's request for a *Frye* hearing was properly denied.

### 7. Motion to Suppress Phone Material

Defendant claims the court erred in denying his Motion to Suppress Phone Material in violation of the Fourth Amendment. Defendant's motion to suppress concerned two of his phones: 1) a cell phone seized in 2016 while Defendant was on juvenile probation in Montgomery County (hereinafter "2016 phone") and 2) an LG phone seized from Defendant's person following his arrest for the Rosendary shooting. Defendant alleges that both phones were unconstitutionally searched without a warrant. Def.'s Supp. Omnibus Pretrial Motion at 2. Defendant also alleges that the warrants issued to search the LG phone were based on insufficient probable cause and were overbroad. *Id.* Evidentiary hearings were held on October 3, 2018 and October 16, 2018. The court denied Defendant's motion to suppress phone material on October 26, 2018. Findings, Memorandum, and Order, 10/26/18.

### a. The 2016 Phone

Defendant concedes that the 2016 phone was validly seized, but asserts that the phone was later unconstitutionally searched without a warrant. Def.'s Supp. Omnibus Pretrial Motion at 2. In 2016, Defendant was on juvenile probation under the supervision of Juvenile Probation Officer Felicia Mickie in 2016. N.T. Motion in Limine I, 10/3/18 at 11. During that time, Defendant was not permitted to have a cell phone, access Facebook, or contact certain individuals believed to be members of ATM. *Id.* at 11, 13. On June 17, 2016, Officer Mickie received an e-mail from Defendant's case worker that Defendant was in possession of a cell phone (2016 phone) with the ability to send messages through Facebook. *Id.* at 12. Officer Mickie reviewed the 2016 phone and saw Defendant's text messages. *Id.* at 14.

46

Following evidentiary hearings, the court issued its Findings, Memorandum, and Order dated October 26, 2018 and specifically addressed Defendant's claims that the search by his juvenile probation officer was unlawful:

> A probationer has limited Fourth Amendment rights because of a diminished expectation of privacy. *Commonwealth v. Williams*, 692 A.2d 1031, 1035 (Pa. 1997) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987)). However, a probationer, like anyone else, "is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Ibid.* (quoting *Griffin*, 483 U.S. at 873, 107 S.Ct. at 3168).

> 42 Pa.C.S.A. § 6304, relating to the powers and duties of juvenile probation officers, provides, in pertinent part: "A personal search of a child may be conducted by any probation officer: (A) If there is a reasonable suspicion to believe that the child possesses contraband or other evidence of violations of the conditions of supervision." 42 Pa.C.S. § 6304(a.1)(4)(i)(A). The statute further provides: "A property search may be conducted by any probation officer if there is a reasonable suspicion to believe that the real or other property in the possession of or under the control of the child contains contraband or other evidence of violations of the conditions of supervision." 42 Pa.C.S. § 6304 (a.1)(4)(ii). Our Supreme Court has stated that 42 Pa.C.S. § 6304 "confirms a juvenile *probationer's* expectation of privacy by *requiring* individualized 'reasonable suspicion.'" *In re J.E.*, 937 A.2d 421, 427-28 (Pa. 2007) (emphasis in original).

> In the instant case, Officer Mickie told Defendant Davis that, as a condition of his supervision while at Sweeney Home, he was not permitted to have a cell phone, to contact certain individuals that were members of ATM, or to access Facebook. (T1 at 11:20-22; 13:21-24; 23:24-24:2; 13:4-10; 33:20-22). She had previously had problems with Defendant Davis sending messages through Facebook and communicating with members of ATM. (T1 at 23:21-24:2). She then received an e-mail from Defendant Davis' caseworker stating that Defendant Davis was found to be in possession of the 2016 phone and that Defendant Davis was able to connect to the internet through the neighbor's Wi-Fi and send messages via Facebook. (T1 at 12:19-23). The court finds that Officer Mickie had a reasonable suspicion that the 2016 phone contained evidence of violations of the conditions of his supervision. Accordingly, the search of the 2016 phone did not violate Defendant

47

Davis' Fourth Amendment rights. Defendant Davis' motion the data recovered from the 2016 phone is DENIED.
Findings, Memorandum, and Order, 10/26/18, at 9-10.

The Defendant's Fourth Amendment rights were not violated in the search of his 2016 phone and the court properly denied Defendant's motion to suppress.

### b. The LG Phone

The LG phone was seized incident to Defendant's arrest and searched after police obtained two search warrants in 2017 and 2018. N.T. Motion in Limine I, 10/3/18 at 63-64, 84-85. The International Mobile Equipment Identity (IMEI), a number used to uniquely identify mobile phones, was used to identify the LG phone for both the 2017 and 2018 search warrants. *Id.* at 76. Detective Kathleen Kelly testified that the IMEI was obtained by "tak[ing] the phone apart and pop[ping] out the battery in the back." *Ibid.* The LG phone was also powered on in an attempt to download its contents. *Id.* at 67-68. The Commonwealth obtained a warrant to search the LG phone on August 9, 2017, but attempts to download its contents were unsuccessful because the phone was locked. *Id.* at 64. No data was recovered from the phone at that time. *Id.* at 65.

A second search warrant was issued on August 3, 2018 to search the LG phone again. *Id.* at 84. By 2018, new technology was developed to bypass the LG phone's password protection and successfully recover the data from the phone. *Id.* at 107-108.

The court's Findings, Memorandum, and Order dated October 26, 2018 specifically addressed Defendant's claims concerning the 2017 and 2018 search warrants and the seizures resulting therefrom:

> Defendant Davis challenges the sufficiency of the affidavits of probable cause for both the 2017 search warrant and the 2018 search warrant. He also argues that the warrants and execution of

48

the warrants were overbroad and the LG phone was searched without a warrant.

"Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a 'totality of the circumstances' test." *Commonwealth v. Rapak*, 138 A.3d 666, 670 (Pa. Super. 2016) (quoting *Commonwealth v. Ryerson*, 817 A.2d 510, 513 (Pa. Super. 2003)). "[D]eference is to be accorded a magistrate's finding of probable cause." *Id.* at 671 (quoting *Ryerson*, 817 A.2d at 514). "[T]he focus is on the information provided to the issuing authority and its response to that information. . . . The role of the reviewing court . . . is to ascertain whether the issuing magistrate appropriately determined that probable cause existed for the issuance of the warrant." *Ibid.* (quoting *Commonwealth v. Huntington*, 924 A.2d 1252, 1256 (Pa. Super. 2007)).

"Although the warrantless seizure of [] cell phones . . . [is] permissible as the result of a search incident to arrest, the subsequent search of [those] phones [is] not. . . . to lawfully search a cell phone, police must first obtain a warrant." *Commonwealth v. Fulton*, 179 A.3d 475, 485 (Pa. 2018); *see also Riley v. California*, 134 S.Ct. 2473, 2494 (2014). The mere act of powering on a cell phone constitutes a search. *Fulton*, 179 A.3d at 488. Further, "even a small, seemingly insignificant act of information gathering by police in a constitutionally protected area is a search." *Ibid.* "Any actions taken unrelated to an otherwise authorized intrusion that result in exposing 'concealed portions' of an area in which a person has a protected privacy interest is, for constitutional purposes, a search." *Ibid.* The disassembly of a phone to view the IMEI constitutes a search. *See Arizona v. Hicks*, 480 U.S. 321, 325 (1987) (holding that the act by police of moving stereo equipment to view its serial number constituted a search).

Although the initial attempt to access the data on the LG phone in 2017 pursuant to the 2017 search warrant may have constituted a search by virtue of simply powering on the phone, this attempt was unsuccessful and no data was recovered. Further, no information obtained as a result of powering on the phone was used in the gathering of other evidence or in obtaining the 2018 search warrant. "Evidence of any kind obtained by police through an unlawful search may not be used in any respect, including as evidence at trial against the subject of the search." *Fulton*, 179 A.3d at 489. However, because no evidence was recovered as a

49

result of the initial attempt to access the data on the LG phone, there is none to suppress.

The 2018 search warrant was based on an affidavit of probable cause that included significantly more detail than the one used to obtain the 2017 search warrant. The affidavit of probable cause supporting the 2018 search warrant contained many details about the events surrounding the shooting which established a probable nexus between Defendant Davis, the LG phone and the shooting of Kendal Rosendary. Notably, one of the phones recovered near the driver's side door of the Impala, iPhone 2, was actively receiving messages shortly after the shooting and immediately after three men fled from the Impala in between the nearby houses. The court finds that there was probable cause, based on the affidavit, to believe that the LG phone was in Defendant Davis' possession during the commission of a crime and that the phone may have been used to communicate with co-conspirators or otherwise contain evidence of criminal activity. Accordingly, probable cause existed to conduct a search of the LG phone and the 2018 search warrant was properly issued. Further, the 2018 search warrant was sufficiently particular with regard to the time period during which data must have been created to be subject to the search as well as the types of data which were subject to the search such that the 2018 search warrant was not overbroad.

Defendant Davis challenges the execution of the 2018 search warrant as being overbroad. He argues that data recovered from the LG phone was outside the time parameters set by the 2018 search warrant. The court finds the metadata in each file regarding the date of creation of that file to be a reliable indicator of the date that file was first created. The data retrieved from the LG phone was more likely than not created within the time parameters outlined by the 2018 search warrant given the fact that Defendant Davis was not permitted to have a cell phone before his return to Pennsylvania from juvenile placement in Arizona in June 2017. Regardless, the Commonwealth only seeks to introduce those files whose metadata indicate they were created within the times permitted by the scope of the 2018 search warrant, from April 1, 2017 to August 9, 2017.

Defendant Davis argues that obtaining the IMEI from the LG phone by partially disassembling it constituted a warrantless search not within any exception. Since the IMEI was used in the affidavit of probable cause to identify the phone and obtain both the 2017 and 2018 search warrants, Defendant Davis argues that

50

any evidence obtained as a result of these warrants is fruit of the poisonous tree.

The testimony regarding how the IMEI was obtained was not entirely clear. Detective Kelly testified that it could only have been obtained by disassembling the phone while Detective Leeds testified that it may have been obtained by simply viewing the exterior of the phone without disassembling it. However, it was the Commonwealth's burden to show that the IMEI was obtained without disassembling the phone, particularly in light of Detective Kelly's testimony to the contrary. "The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H); *see also Commonwealth v. Johnson*, 68 A.3d 930 (Pa. Super. 2013). The Commonwealth has not met this burden.

The court also finds that the search of the LG phone that revealed the IMEI was not incident to Defendant Davis' arrest. The IMEI appears to have been obtained by Detective Kelly a number of hours after Defendant Davis' arrest. Detective Kelly was not at the scene during Defendant Davis' arrest and there was no evidence that any arresting officer obtained the IMEI in a search that occurred immediately after Defendant Davis' arrest. "[W]arrentless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest . . . if the 'search is remote in time or place from the arrest[.]'" *United States v. Chadwick*, 433 U.S. 1, 15 (1977) (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991). "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." *Preston*, 376 U.S. at 368. Since this search was conducted many hours after Defendant Davis' arrest at a different location, it does not fall within the search-incident exception.

"The exclusionary remedy for illegal searches and seizures extends not only to the direct product of the illegality, the primary evidence, but also to the indirect product of the search or seizure, the secondary or derivative evidence." *Fulton*, 179 A.3d at 490. Defendant Davis argues that since the IMEI was used to obtain the 2018 search warrant and the 2018 search warrant ultimately led to successfully accessing and downloading the contents of the LG phone, those contents are fruit of the poisonous tree and must be suppressed. However, even in the absence of the IMEI for the LG phone, the affidavit of probable cause for the 2018 search warrant

51

still described the object of the search, the LG phone, "as nearly as may be" in accordance with Article 1 Section 8 of the Pennsylvania Constitution.

Our Supreme Court has interpreted the "as nearly as may be" requirement of the Pennsylvania Constitution to mean that a warrant must describe the place or thing to be searched "as specifically as reasonably possible." *Commonwealth v. Grossman*, 555 A.2d 896, 899 (Pa. 1989). "The place to be searched must be described 'precise enough to enable the executing officer to ascertain and identify, with reasonable effort, the place intended, and where probable cause exists to support the search of the area so designated, a warrant will not fail for lack of particularity.'" *Commonwealth v. Waltson*, 724 A.2d 289, 292 (Pa. 1998) (quoting *Commonwealth v. Carlisle*, 501 A.2d 664, 667 (Pa. Super. 1985), *aff'd*, 534 A.2d 469 (1987)). Furthermore, warrants should "be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice." *Commonwealth v. Orie*, 88 A.3d 983, 1003 (Pa. Super. 2014) (quoting *Commonwealth v. Rega*, 933 A.2d 997, 1012 (Pa. 2007)).

The affidavit of probable cause for the 2018 search warrant described the thing to be searched as "the LG cellphone found on the person of Jahleel Davis" and also states that the phone found on Defendant Davis' person had a broken screen. (Exhibit C-5). Only one phone was seized from Defendant Davis' person upon his arrest. The description of the LG phone contained in the affidavit of probable cause for the 2018 search warrant, in the absence of the IMEI, was sufficiently particular to enable the executing officer to identify the thing intended to be searched. Accordingly, the data recovered from the LG phone was not fruit of the poisonous tree and Defendant Davis' motion to suppress the data recovered from the LG phone is DENIED.

Findings, Memorandum, and Order, 10/26/18, at 10-15.

The Defendant's Fourth Amendment rights were not violated. The court properly denied Defendant's motion to suppress the data recovered from his LG phone.

## 8. Motion to Suppress Defendant's Statement

Defendant claims the court erred by denying his motion to suppress evidence regarding a statement Defendant gave to police after his arrest. Defendant Davis was interrogated by

52

Detective Michael Crescitelli of the Montgomery County Detective Bureau and Detective Charles Leeds of the Norristown Police Department following his arrest on August 9, 2017 at 4:10 am. N.T. Motion in Limine I, 10/3/18, at 45-46; Motion in Limine I, 10/3/18, Exhibit C-2.

The Court conducted a suppression hearing on October 3, 2018 and October 16, 2018. Detective Crescitelli testified that Defendant was read his *Miranda*[15] warnings before being questioned. *Id.* at 46. Defendant was also given a written copy of the *Miranda* warnings to look over. *Id.* at 47. Defendant confirmed he understood each of the rights that were read to him. *Id.* at 48. He signed and dated his statement and acknowledged he voluntarily spoke to the police. *Id.* at 48, 56. Defendant testified that he read and understood his *Miranda* rights on the day of the interrogation. N.T. Motion in Limine II, 10/16/18, at 154-55.

The court specifically addressed Defendant's claim that his statement was taken in violation of his *Miranda* rights in its Findings, Memorandum, and Order, dated October 26, 2018:

> "[W]henever an individual is questioned while in custody [o]r while the object of an investigation of which he is the focus, before [a]ny questioning begins the individual must be given the warnings established in *Miranda.*" *Commonwealth v. Simala*, 252 A.2d 575 (Pa. 1969) (quoting *Commonwealth v. Feldman*, 248 A.2d 1 (Pa. 1968)). In *Miranda*, the Court explained that
>
>> "[A] defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him."
>
> [*Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).]

---

[15] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Although Defendant Davis testified that he requested an attorney and stated that he wished to remain silent, the court finds that this testimony lacked credibility. Detective Crescitelli testified to the contrary and Defendant Davis himself testified that he signed and dated a written statement of his *Miranda* warnings indicating that he had read and understood those rights. He then proceeded to give a statement, the accuracy of which he affirmed by signing and dating each page of a written transcript of that statement. He also gave testimony indicating that he was treated fairly by the detectives who interrogated him. Accordingly, the court finds that Defendant Davis knowingly, intelligently and voluntarily waived his right to remain silent and to have counsel present during questioning. Defendant Davis' motion to suppress his statement is DENIED.

Findings, Memorandum, and Order, 10/26/18, at 15-16.

The Court properly denied Defendant's motion to suppress his statement.

## 9. Authenticity of Facebook Records

Defendant claims the court erred in overruling Defendant's objection to the authenticity of Facebook records introduced during witness Felicia Mickie's testimony. T3 494-503. Felicia Mickie supervised Defendant as his juvenile probation officer in the summer of 2016. T3 491-92. Through Officer Mickie's supervision of Defendant, she learned that Defendant identified himself as part of the group ATM. T3 492-93. Officer Mickie also knew of other individuals in the group ATM in the summer of 2016. T3 493. The parties stipulated that in 2016, Officer Mickie "c[a]me into lawful possession of a phone possessed and utilized by Jahleel Davis to send messages." *Ibid.* Officer Mickie was aware of the identities of persons Defendant had been messaging on his phone. *Id.* at 496; *See* Exhibit C-173.

At trial, Defendant objected to the Commonwealth's question directed to Officer Mickie about individuals Defendant was messaging. T3 at 495-96. Defendant stated there must be proper foundation before the Commonwealth introduces the identities of the individuals whom Defendant was messaging. T3 497-98. Defendant was not objecting to the authenticity of the

54

Defendant's messages to the recipients, but the authenticity of recipient's messages back to him.[16] *Ibid.* Officer Mickie knew the recipient "Coke Boy Montana," also known as Nathaniel Howard, from personally supervising him in the past. T3 499; 503-04. The Court allowed the Commonwealth to specifically ask about "Coke Boy Montana" after a proper foundation was established, but instructed the Commonwealth to refer to any other individuals generically instead of using specific names. T3 500-502. The Commonwealth proceeded and Defendant objected as follows:

> BY MS. KEMP:
> Q: When you obtained a cell phone from Jahleel Davis, were you able to view individuals that he had been messaging?
>
> A: Yes.
>
> Q: And at the time, were some of these individuals people that he was not to be associated with?
>
> A: Yes.
>
> Q: And were some of these individuals identified, either as self-identified or identified by association with this ATM group?
>
> MR. KOSCHIER: Objection, Your Honor.
>
> THE COURT: Basis?
>
> MR. KOSCHIER: I am renewing my previous objection.
>
> THE COURT: Overruled.
> T3 503.

---

[16] Defendant stated the following during sidebar: "Let me clarify my objection, Your Honor. There needs to be a foundation before she can establish who he was actually messaging. She can say I had his phone, I had his messages, I know these were messages he sent. Insofar as she is going to get into other people's messages and the identity of other people, there is case law that talks about there needs to be a strong foundation to establish the account sending those messages actually belongs to that specific person." T3 497-498.

The Commonwealth introduced a photocopy of the Facebook messages between Defendant and "Coke Boy Montana"/ Nathaniel Howard from 2016. T3 504-505; 507. Defendant's messages had a darker colored background. T3 505. The content of the messages included the following:

> Defendant: Get the drop. We can both slide. You know how I rock.
> Mask up. Let's do it right.
> Nathaniel Howard: When they mask up, they coming for your ice.
> When they bare face, they coming for your life.
> Defendant: RS, bro. All jokes aside on Folk, bro. I've been itching
> to catch another body, bro. And RS, bro, listen, I am
> rapped out, bro, on Folk, so don't really matter to me.
> T3 505-506; Exhibit C-173.

Evidence must be properly authenticated before its admission, meaning "the proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be." *Commonwealth v. Dazey*, 210 A.3d 333, 337 (Pa. Super. 2019). Evidence may be authenticated by testimony of a witness with personal knowledge of its authenticity or by circumstantial evidence using its "distinctive characteristics," such as its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Id.* (citing Pa.R.E. 901(b)(4)). Instant messages, text messages, and social media records can be authenticated using these same criteria. *Id.*; *See In the Interest of F.P., a Minor*, 878 A.2d 91, 95 (Pa. Super. 2005); *Commonwealth v. Koch*, 39 A.3d 996, 1004 (Pa. Super. 2011); *Commonwealth v. Mangel*, 181 A.3d 1154, 1162 (Pa. Super. 2018). In determining the authenticity of Facebook messages, the inquiry should include the following considerations:

> Initially, authentication [of] social media evidence is to be evaluated on a case-by-case basis to determine whether or not there has been an adequate foundational showing of its relevance and authenticity. Additionally, the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the author of the communication in question, such as testimony from the person who sent or received the communication, or contextual clues in the communication tending to reveal the identity of the sender. Other courts examining

56

the authentication of social media records have ruled that the mere fact that an electronic communication, on its face, purports to originate from a certain person's social networking account is generally insufficient, standing alone, to authenticate that person as the author of the communication.

*Dazey*, 210 A.3d at 338-39 (citing *Mangel*, 181 A.3d at 1162) (affirming trial court's admission of appellant's Facebook posts where, among other indicia, the contents of the posts were indicative of appellant's jealousy towards victim in harassment case and victim's sister testified that posts were made after appellant's relationship with ex-boyfriend ended).

Here, the Commonwealth established sufficient evidence regarding the authenticity of Facebook messages from "Coke Boy Montana." Officer Mickie was personally aware that Nathaniel Howard identified himself as "Coke Boy Montana" through her supervision of him as a juvenile probationer. T3 503-504. Office Mickie also knew that some of the individuals whom Defendant had been contacting on his phone were part of ATM. T3 503. The content of the messages between the two include phrases such as "coming for your life" and "catch[ing] another body," consistent with the Commonwealth's theory that they were both part of ATM and engaging in a rivalry with another group. Moreover, like Defendant, Nathaniel Howard was from Pottstown, which is particularly relevant to area-based violence between young men from Pottstown and Norristown. T3 504. The evidence in the record corroborates the identity of "Coke Boy Montana" and the Facebook messages were properly authenticated.

### 10. Expert Testimony - Detective Dirk Boughter

Defendant claims the court erred by overruling Defendant's objections to the Commonwealth's questions of its expert witness Dirk Boughter. T3 525-29; 540-43; 559-66. Detective Boughter has been employed at the Montgomery County Detective Bureau since 2012 and has been in the Major Crimes Unit since 2014. T3 511. Prior to that, he also worked at the

57

Douglass Township Police Department since 2000. *Ibid.* He has received training in how to analyze and process a crime scene. *Ibid.* The parties stipulated that Detective Dirk Boughter was qualified as an expert witness in the field of crime scene analysis. *Ibid.* Defendant alleges that the expert's testimony was outside the scope of his expertise.

Defendant objected to the witness's testimony concerning the direction that fired cartridge casings eject from a semiautomatic weapon as follows:

> Q: How do they [fired cartridge casings] exit a semiautomatic if the gun is held properly?
>
> A: In every gun that I have ever fired or seen fired, a semiautomatic gun will eject to the right and slightly back, behind
> —
>
> MR KOSCHIER: Objection, Your Honor.
>
> THE COURT: The basis?
>
> MR. KOSCHIER: It's outside the area of his expertise.
>
> THE COURT: Overruled.
> T3 527.

The Commonwealth also asked the expert about the scatter pattern of fired cartridge casings when dumped or manually extracted from a revolver. T3 528. Defendant objected, and the court overruled the objection, stating that Defendant could cross examine the witness on these issues. T3 529.

Detective Boughter's expertise in crime scene analysis rendered him qualified to answer a general question regarding the direction of fired cartridge casings from a semiautomatic weapon and the scatter pattern of cartridge casings when dumped from a revolver. He has observed semiautomatic weapons being fired in the past and has fired a semiautomatic weapon himself. T3 527. He has observed what happens to the cartridge casings when they exit the

weapon. *Ibid.* Additionally, Detective Boughter has observed fired cartridge casings being dumped or manually extracted from a revolver both in his capacity as a detective and in his personal life. Detective Boughter's experience and qualification were within the scope of his expertise and the objections were properly overruled.

Defendant also objected to the Commonwealth's question regarding bullet fragments. T3 542. The testimony is as follows:

> Q: Where did you recover a bullet fragment in relation to that vehicle?
>
> A: The front left wheel on the driver's side of that Mazda, on the curb.
>
> Q: When you refer to it as being a bullet fragment, does that indicate anything to you about what had happened to it?
>
> MR. KOSCHIER: Objection; outside the scope of his expert testimony.
>
> THE COURT: Overruled.
>
> THE WITNESS: It was a fired bullet.
> T3 542.

Here, the Commonwealth's question calls for a basic understanding of bullet fragments. As an expert in crime scene analysis, it is expected that Detective Boughter understands that when a bullet is fired, it can create a "bullet fragment." Detective Boughter had also stated before this line of questioning that he has training and experience to "detect what is out of place" and "evaluating what [ ] your eye tell[s] you." T3 540-41. Detective Boughter's opinion that a bullet fragment resulted from a fired bullet was within the scope of his expertise.

The Commonwealth also asked Detective Boughter questions regarding a sketch he and Detective Schikel created together to show an overall representation of the crime scene. T3 554; Trial Exhibit C-141. Detective Boughter specified that this was not a scaled sketch, meaning that

59

items and distances in the sketch were not exactly measured. *Ibid.* The witness used the photographs taken and the notes taken at the crime scene to create the sketch. T3 556. The spent shell casings were color-coded to differentiate the various calibers and were labeled numbers one (1) though thirty-two (32).[17] T3 558. Defendant again objected to the fired cartridge casings on the same basis and the court overruled his objection. T3 559. Defendant objected to the following question:

> Q: When you are observing what appears to move from 1 all the way to 16, does that imply movement of the shooter?
>
> MR. KOSCHIER: Objection, Your Honor; ballistics.
> T3 559.

During sidebar, the Commonwealth stated that the witness would testify that the location of the ejected shell casings imply movement by the shooter. T3 561-62. The Court stated that the Commonwealth had not established either the distance the cartridge casings traveled when ejected from the weapon or the type of firearm that would create such a distance. T3 562. The Commonwealth stated it would ask additional questions to establish these variables. *Ibid.* Defense counsel stated that the pattern of cartridge casings is "not always back and to the right" and the Court stated that counsel could develop that fact on cross examination. T3 562-63. Defendant made the following objections as the Commonwealth continued to establish the shooter's movement:

> Q: And if you stand in one location, do the fired cartridge casings sort of eject in the same general location?
>
> MR. KOSCHIER: Objection, Your Honor; the same basis.
>
> THE COURT: Overruled.

---

[17] The spent cartridge casings in Exhibit c-141 were color coded by caliber as follows: Green (9 millimeter), Blue (.40 caliber), Purple (.45 caliber), and Orange (bullet specimens/fragments). T3 558.

60

THE WITNESS: Based on my experience, yes, in the same general area.

BY MS. KEMP:

Q: When I am saying the same general area, say, for example, if an individual standing at the position of 13 and is standing stagnant, you might expect 3, 4, and 5 to all sort of come from that same firearm; is that correct?

MR. KOSCHIER: Objection.

THE COURT: Your basis?

MR. KOSCHIER: The same basis.

THE COURT: If that's the basis of your objection, I am overruling it.

. . .

Q: If an individual is standing still and -- or I apologize. If an individual is moving either closer or further away from a target, would you expect the fired cartridge casings to be at different distances from one another?

MR. KOSCHIER: The same objection, Your Honor.

THE COURT: Overruled.

. . .

Q: So if, for example, in observing what we have here, where there appears to be a distance between Fired Cartridge Casing 1 and Fired Cartridge Casing 2 -- or I apologize, 16, would that be consistent with an individual moving either -- say they started firing at 16 and moving backwards towards one or vice versa?

MR. KOSCHIER: The same objection, Your Honor.

THE COURT: Have you established what the distances are between those two points?

MS. KEMP: Your Honor, the sketch is not to scale. This is just a demonstrative of where they were found.

THE COURT: This is a general question calling for a general answer?

61

MS. KEMP: Yes, Your Honor.

THE COURT: Okay. You can answer.

THE WITNESS: I would say given my observations out on the scene, that No. 16 and No. 1 were at least definitely two different positions for the shooter.
T3 563-66.

Here, Detective Boughter gave answers to general questions such as the location of fired cartridge casings if a shooter was stagnant or moving. T3 563. Again, this is within the scope of his expertise based on his training and experience. Detective Boughter also offered an opinion regarding differing locations of the fired cartridge casings and its meaning in terms of movement of a shooter. The expert was analyzing the crime scene as he was qualified to do. Detective Boughter's testimony was within his scope of expertise and all objections were properly overruled by the court.

## 11. Defendant's Request for Mistrial for Destruction of Notes/Diagrams

Defendant claims the court erred by denying Defendant's request for a mistrial based on Detective Boughter's testimony that he destroyed notes and diagrams he created of the crime scene which he relied upon to create his written report and his demonstrative display. T3 585-592. Detective Boughter used exhibit C-141, a sketch he created of the crime scene with Detective Schikel. Defendant raised the following issue, outside the presence of the jury, as follows:

MR. KOSCHIER: Yes, please. As the witness was testifying, he made references to various diagrams that he's using to create the demonstrative evidence the Commonwealth presented. I believe those diagrams are a part of mandatory discovery. They're documents or other tangible objects that should have been provided to defense.

> The defense needs those in order to cross-examine him on the accuracy of that diagram and other objects. Because we weren't provided that in advance, I move for a mistrial.
>
> To the extent which Your Honor declines to provide that, I am requesting those be given to us immediately to assist us in the cross-examination of this witness, Your Honor.
> T3 584.

Detective Boughter was questioned by the parties regarding this issue. T3 585-92. Detective Boughter testified he destroys his rough notes or diagrams at a crime scene after a report is created "so that it doesn't get confused with any other cases." T3 586. He testified that he used initial rough sketches he made at the crime scene to create a report, destroyed those initial rough sketches after making the report, and subsequently used his report and photographs to create the diagram used at trial, C-141. *Id.* at 588-89.

Defendant moved for a mistrial on various grounds, including a discovery violation, lack of scale in the diagram creating a misrepresentation to the jury, and the Commonwealth's duty to retain evidence. T3 589-92. The court found there was no discovery violation by the Commonwealth. T3 590. With regard to the misrepresentation to the jury for the diagram's lack of scale, the court informed Defendant he could cross-examine the witness on the "accuracy and reliability" of the diagram. T3 590-91. With regard to the Commonwealth's duty to retain evidence, the Defendant stated the following:

> And, Your Honor, my final basis for requesting a mistrial is an absolutely novel one. This is not currently the law in the Commonwealth, but it is my position the law should change regarding the Commonwealth's duty to retain evidence in advance of litigation.
>
> Currently we follow *Arizona v. Youngblood*, which the Supreme Court of the United States created, which places absolutely no duty on the Commonwealth to retain evidence. My belief is that

63

that is constitutionally in error; that it violates the due process under the Pennsylvania Constitution, not the Federal Constitution.

And I do believe the Commonwealth has certain duties to retain evidence and other documents in advance of litigation. And I am requesting a mistrial on that basis.

And I purely request that for later appellate purposes, if necessary, Your Honor.
T3 591-92.

The court denied Defendant's motion. T3 592.

The Defendant claims on appeal that the denial of a request for a mistrial is a violation of Defendant's confrontation and due process rights. Detective Boughter's destruction of notes and diagrams was not a violation of Defendant's confrontation rights warranting a mistrial. *See Commonwealth v. Pickering*, 533 A.2d 735 (Pa. Super. 1987) (affirming that no mistrial was warranted where police officer testified that she had destroyed her original handwritten notes detailing her interactions with defendant in a drug trade that were used to create a typed report). The material contained within the rough notes and sketches were "substantively incorporated" into the officer's report and resulting diagram, and therefore "would have merely been cumulative evidence." *Id.* at 737. Here, Defendant was still provided an opportunity to cross examine the witness about the same content that was allegedly "destroyed." Additionally, Detective Boughter testified that he destroyed his initial notes and sketches for organizational purposes and not due to any bad faith. *Id.* Defendant's confrontation rights were not violated.

The destruction of Detective Boughter's prior notes and diagrams is not a violation of Defendant's due process rights. Evidence must be preserved if it "(1) possess[es] an exculpatory value that was apparent before the evidence was destroyed, and (2) also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means." *See Commonwealth v. Tillia*, 518 A.2d 1246, 1250 (Pa. Super. 1986) (citing *California v. Trombetta*,

64

467 U.S. 479, 489 (1984)) (finding that destruction of appellant's blood sample for independent testing did not violate appellant's due process rights). Here, evidence contained in Defendant's initial work product was highly unlikely to contain exculpatory evidence. *Id.* at 1251. The same information, including any potentially exculpatory information, was later incorporated into Detective Boughter's report and diagram admitted at trial. *See* Exhibits C-110, C-141. Defendant still had the ability to question the accuracy and reliability of the witness's findings. *See id.* at 1251-52. Defendant's due process rights were not violated and Defendant's request for a mistrial was properly overruled.

### 12. Prior Bad Acts

Defendant claims the court erred in granting the Commonwealth's motion in limine permitting introduction of prior bad acts in violation of Pa.R.E. 403, 404(a), 404(b) and the due process clauses of the United States and Pennsylvania constitutions. *See* Commonwealth's Motion in Limine and Response to Defense Motions; Commonwealth's Supplemental Motion in Limine. The Commonwealth's motions sought to admit evidence recovered from defendants' phones, showing Defendant's association with Pottstown and the feud between the Pottstown and Norristown groups. Evidence from defendants' phones included photographs, videos, and Facebook records on a flash drive.[18] N.T. Motion in Limine II, 10/16/18, Exhibit C-11. Images from co-defendant Jones' phone show him in possession of firearms with Taron Ebo-Wilson. N.T. Motion in Limine II, 10/16/18, at 239. Images from Defendant Davis' phone depict Defendant in possession of firearms. One video shows Defendant saying "gang, gang" and "BGB." *Id.* at 241. Defendant Davis' Facebook postings reference the death of Jordan Scott and Defendant's desire for revenge. *Id.* at 241-42.

---

[18] The flash drive contained data from the following individuals' phones: Defendant Davis, co-defendant Jones, Taron Ebo-Wilson, and Ahbayah Davila. N.T. Motion in Limine II, 10/16/19, Exhibit C-11.

Following evidentiary hearings on these matters, the court entered an order allowing for the admission of some, but not all, of the pictures, videos and Facebook records recovered from defendants' phones. *See* Order, dated 10/26/18. Images and videos that showed weapons not used in the shooting were not admissible. *Ibid.* All other content that was not specifically excluded was conditionally admitted as long as the Commonwealth laid the proper foundation and proved its relevance at trial. *Ibid.*

The admission of evidence is reviewed for an abuse of discretion. *See Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014). The evidence introduced by the Commonwealth of photographs, videos, and Facebook records obtained from Defendant's phone were properly admitted. Pa.R.E. 404(b) states the following:

> (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) *Permitted Uses.* The evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.
> Pa.R.E. 404(b).

Here, the evidence was admissible to prove the Defendant's motive. *See Hairston*, 84 A.3d at 669-70 (affirming trial court's admission of evidence regarding appellant's prior sexual assault of stepdaughter and pending litigation regarding the matter as motive to commit murder of stepdaughter's mother and half-brother); *Commonwealth v. Cascardo*, 981 A.2d 245, 251-52 (Pa. Super. 2009) (affirming trial court's admission of evidence regarding appellant's loan sharking business as motive to kill victim). The Commonwealth's theory of the case was that Defendant

66

came from Pottstown to Norristown to retaliate for the murder of his friend, Jordan Scott. After Jordan Scott's death, Defendant's Facebook records demonstrate his motive to kill:

1) "Death is never a option or planned but revenge is." T5 1044-1045.

2) "RS, Bud gone, so the love is gone …its war now." T5 1048.

3) "Losing Bud turned me to a monster. The thought of losing another made me grind harder." T5 1047.

4) "Yeah, nigga wanna beef, grab bigger guns." T5 1146-47.

These statements started the day after Jordan Scott's murder, on July 7, 2017, T5 1044-1045, showing that the Rosendary shooting "grew out of or was in any way caused by the prior set of facts and circumstances." *See Hairston*, 84 A.3d at 670 (citing *Commonwealth v. Drumheller*, 808 A.2d 893, 906 (Pa. 2002)).

Evidence regarding Defendant's affiliation with the groups ATM/ BGB and its members, along with the feud between Pottstown and Norristown was admissible to prove the conspiracy. *See Commonwealth v. Gwaltney*, 442 A.2d 236, 240-41 (Pa. 1982) ("Since appellant was charged with criminal conspiracy, evidence of the gang activity involved in the present case is highly probative of whether a conspiracy existed."). Evidence showing Defendant's association with ATM/ BGB or its members is probative of the defendant's conspiracy to commit murder in retaliation for the death of Jordan Scott. A video where Defendant says "gang gang" and "BGB" are indicative of defendant's affiliation with the Pottstown group. T5 1029-1030.

The photographs and videos showing the Defendant or other individuals in possession of firearms were properly admitted at trial. A weapon that could have been used in the commission of the crime is admissible:

67

> A weapon not 'specifically linked' to the crime is generally inadmissible' however, the fact 'the accused had a weapon or implement suitable to the commission of the crime charged…is always a proper ingredient for the case for the prosecution.' *Robinson*, at 351 (alteration in original) (citation and internal quotation marks omitted). 'Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence.' *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1260 (1994) (citing *Commonwealth v. Coccioletti*, 469 Pa. 103, 425 A.2d 387, 390 (1981)). 'The only burden on the prosecution is to lay a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime.' *Lee*, at 652 (citing *Commonwealth v. Thomas*, 552 Pa. 256, 561 A.2d 699, 707 (1989) ("If a proper foundation is laid, the weapon is admissible where the circumstances raise an inference of the likelihood that it was used.")).

*Commonwealth v. Christine*, 125 A.3d 394 (Pa. 2015). Here, the court only allowed photographs or videos of firearms that could have been used in the shooting. Order, 10/26/18. Any images that contained weapons that could not have been used in the shooting were cropped out. *Ibid.* The Commonwealth provided the court with testimony from Detective Eric Nelson of each image and video it intended to use to determine the caliber of the firearm. N.T. Motion in Limine II, 10/16/18, at 246-47; 249-279. There were four different caliber guns that were shot in the victim's direction: a 9 millimeter, .40 millimeter, a .45 millimeter, and a .38 millimeter. N.T. 10/16/18, at 243. Any images of firearms not used in the actual shooting, based on the firearm's caliber, were not admitted at trial. Order, 10/26/18.

Defendant asserts that the evidence of Defendant's ATM/BGB affiliation, feud with a rival group, and evidence of possession of firearms is more prejudicial than probative, in violation of Pa.R.E. 403. Evidentiary rulings will not be reversed absent an abuse of discretion. *Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014). Here, all of the evidence that was admitted was highly probative of Defendant's guilt as it showed his motive and plan to kill. *See Commonwealth v. Flamer*, 53 A.3d 82, 89 (Pa. Super. 2012) (finding that Commonwealth's

68

testimonial evidence establishing motive and conspiracy were more probative than prejudicial). All of the evidence admitted had high probative value outweighing any prejudicial effect and was properly admitted.

**CONCLUSION**

For the foregoing reasons, the court respectfully recommends that Defendant's judgment of sentence should be AFFIRMED.

BY THE COURT

RICHARD P. HAAZ,                    J.

Copies sent hand delivered /2/27/19 to:
Kevin Steele, Esquire
Robert Falin, Esquire
Christopher W. Koschier, Esquire
Superior Court of Pennsylvania

Judicial Secretary

69